## POLAR ICE CREAM & CREAMERY CO. *v.* ANDREWS ET AL., CONSTITUTING THE FLORIDA MILK COMMISSION, ET AL.

No. 38.   Argued November 20, 1963.—Decided January 6, 1964.

*Joe J. Harrell* argued the cause for appellant. With him on the briefs was *J. A. McClain, Jr.*

*Mallory E. Horne* and *Johnson S. Savary* argued the cause for appellees. With them on the brief were *Richard W. Ervin*, Attorney General of Florida, and *Joseph C. Jacobs*, Assistant Attorney General.

MR. JUSTICE WHITE delivered the opinion of the Court.

We have before us the recurring question of the validity of a State's attempt to regulate the supply and distribution of milk and milk products. Challenged in this case

is Florida's system of regulation of the dealings between milk distributors and local producers.

The appellant, Polar Ice Cream & Creamery Company, located in Pensacola, Florida, 16 miles from the Florida-Alabama state line, is a processor and distributor of fluid milk and milk products. It sells fluid milk and milk products for human consumption to consumers and dealers within the State of Florida in competition with nearby Alabama distributors. Pursuant to contracts let after competitive bidding, it also supplies large quantities of milk to military installations, both within and without the State of Florida. It purchases, processes and sells as fluid milk or milk products approximately 5,000,000 gallons of milk each year.

Prior to the regulations challenged here, Polar purchased approximately 30% of its milk requirements from dairy farm producers located within the State of Florida. The remaining 70% was procured from producers, producer pools or brokers in other States, such as Alabama, Mississippi, Wisconsin, Minnesota, Missouri, Virginia, and Illinois. Its customary arrangement with Florida producers was to pay 61 cents per gallon for a specified quantity of milk from each producer and approximately 35.5 cents per gallon for all milk over that quantity. The price Polar paid its out-of-state sources varied; some milk was purchased for as low as 30–35 cents per gallon from Alabama, Virginia, and Arkansas sources. Polar's Florida producers could at no time supply all of Polar's milk requirements, but at times produced and sold to Polar amounts equal to or greater than Polar's sales of fluid milk for human consumption to consumers and dealers in Florida, excluding sales to the military, sales on reservations, and sales to local schools.

The statute and the orders of the Florida Milk Commission challenged by Polar regulate the dealings between milk distributors and milk producers located within

the Pensacola Milk Marketing Area.[1]  First, they require that a Pensacola milk distributor pay a minimum price of 61 cents per gallon for all milk purchased from Pensacola producers and sold in Florida as Class I milk, defined as fluid milk or milk products sold in fluid form with exceptions, and substantially lower minimum prices for milk

---

[1] Chapter 501 of the Florida Statutes establishes a comprehensive scheme for regulation of the milk industry and establishes the Florida Milk Commission. The Act empowers the Commission, *inter alia,* to supervise and regulate the entire milk industry, including the production, transportation, manufacture, storage, distribution and sale of milk, to establish milk markets within the State, to fix prices to be paid producers within a regulated marketing area by distributors, milk dealers and producer-distributors, and generally to adopt and enforce all rules, regulations, and orders necessary to carry out the purposes of the Act. Fla. Stat. § 501.04. In addition the Commission is authorized to revoke or suspend the license of a milk distributor or dealer when satisfied that the dealer or distributor has rejected or refused milk delivered by a producer in ordinary continuance of a previous course of dealings or when satisfied that the dealer or distributor has committed any act injurious to the public health or public welfare in demoralization of the price structure of pure milk to such an extent as to interfere with an ample supply. Fla. Stat. §§ 501.09 (3) (a), (c). Before the Commission may exercise its supervisory and regulatory powers in any marketing area, however, at least 10% of the producers in that area must petition the Commission for such regulation and a majority of the producers in that area must vote in favor of regulation. Fla. Stat. § 501.20 (1).

In November 1961, the dairy farmers producing milk in the four westernmost Florida counties, Escambia, Santa Rosa, Okaloosa and Walton, voted to place that area under the control of the Florida Milk Commission and thereby subject to the provisions of the Florida Milk Control Act and the orders issued pursuant thereto. Thereupon in January 1962, the Commission issued a series of orders covering the four-county area, termed the Pensacola Milk Marketing Area, and a letter to Polar Ice Cream & Creamery Co. specifying its obligations under the newly imposed regulatory structure. In August 1962, the Commission issued other orders and rules further implementing and defining the earned-base allocation plan challenged herein.

sold as Class II, III, and IV milk,[2] consisting chiefly of nonbeverage milk such as cream, sour cream and other dairy products.

---

[2] The minimum price established in Official Order PEN–4, January 18, 1962, for the Pensacola area for Class II milk was 1 cent per gallon less than the minimum price established for this class milk in the Miami, Florida, Federal Milk Marketing Order, No. 118, and for Class III milk was 26 cents per gallon. There was no price set for Class IV utilization in this order. Official Order No. 20–29, covering all regulated marketing areas in Florida, effective March 4, 1962, retained the 61 cents per gallon minimum on Class I milk, and adopted the monthly prices in the Miami, Florida, Federal Milk Marketing Order, less 1 cent per gallon, for Class II, III and IV milk. All of the above prices are subject to minor adjustments for variations from the 4% average butterfat content of the milk distributed in each class.

Classes of milk are defined as follows in Official Order No. 20–28:
"IT IS HEREBY ORDERED THAT:
"1. CLASS I MILK is hereby defined as all fluid milk or milk products sold in fluid form with the exception of buttermilk, chocolate drink and cream.

. . . . .

"2. CLASS II MILK shall be all skim milk and butterfat:
"(a) Used to produce acidophilus milk, buttermilk, chocolate drink, half and half, light cream, heavy cream and sour cream, and
"(b) Contained in inventories in the form of milk products designated as Class I milk pursuant to paragraph (1) of this section on hand at the end of each month and accounting period; *provided,* that Class II classification of shrinkage prorated to skim and butterfat, respectively, in producer milk shall not exceed two per cent (2%) of skim and butterfat in producer milk.
"3. CLASS III MILK shall be all skim milk and butterfat:
"(a) Used to produce any product other than those specified in paragraphs (1) and (2) of this section;
"(b) That portion of fortified milk or skim milk not classified as Class I milk pursuant to subparagraph (1)(a) of this section, and
"(c) In total shrinkage of skim milk and butterfat, respectively, such shrinkage to be prorated to producer milk and other source milk received in the form of fluid milk or skim milk.
"4. CLASS IV MILK shall be all milk the skim portion of which is:
"(a) Disposed of for fertilizer or livestock feed, and
"(b) Dumped after such prior notification as the Commission administrator may require."

Second, the Commission has established a method by which a proportion of a distributor's monthly sales in various classes is allocated to designated Pensacola producers. Each Pensacola producer with whom Polar does business between September 1 and November 30 of each year, called the base-fixing period, is assigned an earned base, representing the ratio of milk delivered by such producer to the total milk delivered by all of Polar's Pensacola producers during the base-fixing period. The resultant percentage is then applied to the number of gallons of milk Polar sells in Class I, II, III, and IV channels monthly, in that order, to determine the number of gallons for which each earned-base producer must be paid the minimum prices assigned to each class or utilization.[3]

---

[3] Milk utilized by the consumer in fluid form, beverage milk, commands a substantially higher price than milk of the identical quality which is used to make manufactured milk products, such as butter, cheese, ice cream and so forth. Accordingly the processor or distributor of milk is able to pay the producer a higher price for milk which is sold in fluid form for human consumption, and most milk-pricing systems require milk to be classified according to use. See *Lehigh Valley Coop. v. United States,* 370 U. S. 76, 79. The milk industry generally maintains a reserve to meet the changing demands for beverage milk. Since the supply of milk is greater than the demands of the fluid milk market, the excess, referred to as surplus milk, must be channeled to the less-desirable, lower-priced outlets. This explains how Polar is able to purchase milk in Alabama and other States for as low as 30 and 35 cents per gallon and how Polar was able to pay its producers, prior to regulation, as high as 61 cents per gallon for a specified quantity of milk.

Where a distributor sells milk in both fluid and manufactured forms, problems of allocation arise. Under Federal Milk Marketing Orders establishing marketwide pools, the total proceeds received from the sale of milk by regulated handlers or distributors are pooled. A "blend" or average price is calculated by multiplying the "pool" milk disposed of in each class by the established minimum prices for each class, with some further adjustments not pertinent here. See *Lehigh Valley Coop., supra,* at 80. The "blend" price is then divided among the producers according to the amount of milk each producer sells, re-

The allocation of a producer's deliveries must first be to Class I utilization, with allocation continued thereafter in descending order through the lower classifications. Only deliveries by Pensacola producers are considered in calculating the ratio of each producer's deliveries to total deliveries to Polar during the base-fixing period and therefore the percentage assigned to these producers totals 100%. The result is that all of Polar's Class I sales must be attributed to its Pensacola earned-base producers. Only then may their milk be used for the less remunerative utilizations, and only if these producers do not fulfill Polar's need for Class I milk may other milk be used for this purpose and thus command a premium price. Moreover, the formula requires that all the milk Polar sells in Florida be first attributed to the purchases that it makes from Pensacola producers.[4] The earned-base percentages remain the same until the next base-fixing period.

---

gardless of the use to which his milk is actually put. The blend price thus represents an average based upon the combined use of all regulated milk within a marketing area.

[4] Until the Florida Milk Commission's Rule 220–1.05 was promulgated on August 24, 1962, the applicability of the allocation provision to milk utilized in less than Class I channels was unclear. The Commission's letter of January 25, 1962, to Polar's earned-base producers, assigning them bases for 1962, specified that the bases entitled them to that percentage of Polar's Class I milk sales each month, without referring to Class II, III or IV utilizations. The total of the percentages assigned to these 26 producers was 100%, thus entitling them collectively to all of Polar's Class I sales for 1962.

Rule 220–1.05 (6) provides:

"BASE PERCENTAGE; COMPUTATION AND APPLICATION.

"(a) During the base fixing period, a base percentage shall be determined for each producer by calculating the ratio of the milk delivered by each producer to the total milk delivered by all producers for the entire base fixing period, which percentage is referred to herein as 'earned base.' This computation shall be made immediately following the close of the base fixing period, and within thirty

Third, the statute forbids termination of the business relationship between a distributor and producer with whom the distributor has had a continuous course of dealings without just cause and provides that rejection or refusal to accept any milk tendered or offered for delivery by a producer in ordinary continuance of a previous course of dealings is a ground for revocation of the distributor's license.[5] These statutory provisions have been construed

---

(30) days thereafter, each producer shall be notified by mail of his base percentage and the base percentage of all other producers participating in that particular base. During this period, each plant shall supply the local Deputy Administrator with a summary of its base computations. The producer notification must illustrate how the base percentage for the producer concerned has been determined.

"1. The base percentage earned by each producer shall be applied to the total number of gallons of milk utilized in Class I channels by each distributor and producer-distributor to determine the number of gallons of milk for which the producer must be paid at the Class I price fixed by the Commission. In case a producer fails to produce the amount of milk that his 'earned base' entitles him to, in Class I channels, such deficit must be reallocated to the other 'earned base' producers in proportion to their 'earned bases,' and the Class I price paid for the milk so reallocated.

"2. The method outlined above for computing allocations to Class I utilization shall be followed in computing allocations for all other classes.

"3. First allocation of a producer's deliveries shall be to Class I utilization, with allocation continued thereafter in descending order of price through Class IV classification. The balance of any producer's production after the above allocations may then be placed in the lowest price classification.

"4. In computing Class I sales to be allocated to producers, no adjustment shall be made for milk received by distributors and/or producer-distributors from sources other than 'earned base' producers."

[5] Section 501.05 (3) provides:

"The relationship between a producer and a distributor, under which milk produced by the producer is regularly delivered to and accepted by the distributor, when once established, shall not be

to mean that a Florida distributor in a regulated marketing area must accept from his earned-base producers all the milk tendered by such producers, including milk in excess of Class I needs. A distributor is relieved of the obligation to purchase milk from earned-base producers only upon a showing of just cause, which is not met by a demonstration that the Commission's minimum prices are burdensome or that milk is available elsewhere at a lower price.[6]

terminated either by the producer or by the distributor without just cause therefor, and the approval of the commission. Just cause will be considered by the commission as any cause deemed just by a prudent and reasonable man."

Section 501.09 (3) provides: "The commission may decline to grant any license . . . or revoke a license . . . when satisfied of the existence of any of the following . . .

"(a) That a milk dealer has rejected, without reasonable cause, any milk delivered to and accepted by the milk dealer from a producer delivered by or on behalf of the producer in ordinary continuance of a previous course of dealing, or that a milk dealer has rejected without reasonable cause, or has rejected without reasonable advance notice, any milk tendered or offered for delivery to the milk dealer by or on behalf of a producer in ordinary continuance of a previous course of dealing. It is intended hereby to provide and require that a milk dealer shall not reject or refuse to accept any milk tendered or offered for delivery by or on behalf of a producer in ordinary continuance of a previous course of dealing unless there exists reasonable cause for the rejection or refusal to accept such milk and unless the milk dealer has also given . . . advance notice . . . ."

[6] In *Borden Co.* v. *Odham,* 121 So. 2d 625, the Florida Supreme Court upheld the Commission's power to apply the percentage allocation provisions to Class II and III as well as Class I milk and to require a distributor to accept milk in excess of Class I requirements, so long as the Commission acted reasonably. However, since the statute at that time only required reasonable notice for a refusal of milk delivered in the ordinary course of dealings between a distributor and producer, the court held that the Commission's additional requirement of just cause was beyond its authority. The statute, note 5, *supra,* has subsequently been amended to require both

It is this three-pronged regulatory structure, requiring Polar to accept its total supply of Class I milk, military milk aside, from designated Pensacola producers at a fixed price, and obligating it to take all milk which these producers offer, which Polar argues imposes an undue burden on interstate commerce.[7]

The Florida Milk Commission also proposed special provisions dealing with milk that is sold to military in-

---

just cause and reasonable notice before refusal or rejection of milk delivered by an earned-base producer is permissible.

In *Florida Dairy, Inc.,* v. *Florida Milk Comm'n,* 149 So. 2d 867, a milk distributor sought to terminate its relationship with producers on the ground that it could produce its own milk at a lower price than that paid to producers and that the required prices rendered the distributor unable to meet the competition from producer-distributors in its area. The Commission's finding that just cause was not met by this showing because of the injury to producers that would result from the termination and the consequent loss of business was upheld. See *Foremost Dairies* v. *Odham,* 121 So. 2d 636, upholding over Commerce Clause objections a Commission order providing for an annual base-fixing period and providing that base percentages earned by each producer are applicable to all classes of milk.

Mr. E. V. Fisher, Administrator of the Florida Milk Commission, testified below that Polar is required to accept all the milk produced and tendered by Polar's earned-base producers, and that refusal of any milk tendered without just cause is ground for a show-cause order and disciplinary proceedings. And see Rule 220-1.05 (4), (6).

Official Order PEN-2, however, provides that an earned-base producer who delivers milk in excess of Class I needs during the base-fixing period may have his subsequent earned-base reduced; this order is to discourage Pensacola producers from increasing their production to the point of supplying surplus milk, defined as milk in excess of Class I needs.

[7] In the court below and in the jurisdictional statement filed with this Court, Polar also objected that this regulatory structure violated the due process and equal protection of the laws provisions of the Fourteenth Amendment. However, Polar has not pursued these issues in its brief or argument before this Court. They appear on their face to be without merit, and, in any case, our resolution of the other claims asserted renders a decision on these issues unnecessary.

stallations of the United States—military milk. Although challenged by Polar at the outset of this litigation, this plan was not voted into effect. While the present status of military milk under Florida law is not entirely clear from the record or arguments of the parties, we read the testimony of the Commission to mean that Polar is not required to purchase military milk from its Pensacola producers, as it is Class I milk. However, if Polar does utilize milk obtained from its earned-base producers for military sales, it must pay the minimum price applicable to Class I sales. Polar challenges this producer price requirement as inconsistent with the federal procurement policy of competitive bidding, and the Federal Government's exclusive jurisdiction over the installations on which this milk is consumed.

To finance the activities of the Milk Commission, Florida imposes a tax or regulatory fee of 15/100 of 1 cent per gallon of all milk handled by Florida distributors regardless of where purchased or to whom it is sold, including milk that Polar sells to military installations. This tax abates if at any time the revenue exceeds by 25% the total amount of Commission expenditures as budgeted for that fiscal year.[8] Polar, which clearly is obliged to pay

---

[8] Fla. Stat. §§ 501.09 (4) (b), 501.09 (8):

"For the privilege of continuing in or engaging in the business of distributing milk or acting as a distributor under the provisions of this chapter, there is imposed upon every distributor a tax in an amount equal to fifteen-one hundredths of one cent upon each gallon of milk distributed by each distributor during each calendar month. The amount of such tax shall be remitted by each distributor to the commission at the time that the monthly reports are required to be filed by the distributor with the commission as provided by this chapter."

"If at any time during a fiscal year the revenues received by the commission under this chapter exceed by at least twenty-five per cent the total amount of expenditures as budgeted by the commission for that fiscal year, the payment of taxes provided for in this subsection,

this fee, contends that the State is without jurisdiction to include milk sold and delivered to military reservations, exclusive jurisdiction to which has been ceded to the United States, in calculating the amount of the tax.

Since Polar's objections to the Florida Milk Control Act posed substantial federal questions, a three-judge District Court was convened, 28 U. S. C. § 2281, and testimony was taken and arguments heard in respect to the above questions. This court found that the Florida Milk Control Act was a reasonable exercise of the State's police power and accordingly rejected Polar's claims that the Act, in fixing producer prices without assuring Polar any rate of return and in compelling Polar to take all the milk of its earned-base producers, denied it due process of law and equal protection. The District Court also found that Florida's fee on milk distributed by Polar to military installations was a regulatory fee based on the privilege of doing business in Florida and not a tax and concluded that this measure therefore did not unduly burden interstate commerce or infringe upon the exclusive jurisdiction of the United States over the military installations Polar serves. The Florida producer price controls were said not to conflict with the Federal Procurement Statutes, 10 U. S. C. § 2301 *et seq.*, since they did not impose any restriction on the price paid by the Federal Government for its purchases from Polar. Although finding that the Florida regulations were intended to protect and favor Florida milk producers, the court upheld these regulations over Commerce Clause objections because there was no showing that the alleged discrimination against out-of-state

and in § 501.09 (4), on milk distributed by distributors, will be discontinued and such taxes are not imposed for the calendar months remaining in that fiscal year commencing with the first calendar month following the time when such revenues so collected exceed by at least twenty-five per cent the total amount of expenditures so budgeted for that fiscal year."

producers burdened or restricted interstate commerce. The decision in *Baldwin* v. *Seelig,* 294 U. S. 511, invalidating a state restriction imposed on a milk distributor to shield local milk producers from the effects of out-of-state competition, was deemed inapplicable to Florida's regulations. Because of the serious questions raised under the Commerce Clause and previous decisions here dealing with milk regulations, we noted probable jurisdiction. 372 U. S. 939. We have determined that under prior cases in this Court dealing with state regulation of the milk industry the Florida law as applied in this case cannot withstand attack based upon the Commerce Clause and that the judgment below must be reversed.

## I.

The controlling cases are *Baldwin* v. *Seelig,* 294 U. S. 511; *Hood & Sons* v. *Du Mond,* 336 U. S. 525; and *Dean Milk Co.* v. *Madison,* 340 U. S. 349.

In *Baldwin,* the Metropolitan Milk District in the State of New York obtained about 70% of its supplies from New York sources, the remaining 30% from other States. The New York law forbade the sale in New York of milk obtained by a distributor from other States unless the distributor had paid a price which would be lawful under the New York price regulations. This provision was attacked by a New York milk distributor, all of whose milk supply was purchased in Vermont for less than the established New York price. Remarking that the New York law aimed at keeping "the system unimpaired by competition from afar," 294 U. S., at 519, the Court struck down this provision as an impermissible burden upon interstate commerce. New York could not outlaw Vermont milk purchased at below New York prices, for to do so would "set a barrier to traffic between one state and another as effective as if customs duties, equal to the price differential, had been laid upon the thing transported," 294 U. S., at 521—which is forbidden to the States by the Constitu-

tion, Art. I, § 10, cl. 2, and reserved to Congress by Art. I, § 8, cl. 3. Nice distinctions between direct and indirect burdens were said to be irrelevant

> "when the avowed purpose of the obstruction, as well as its necessary tendency, is to suppress or mitigate the consequences of competition between the states. . . . [A] chief occasion of the commerce clauses was 'the mutual jealousies and aggressions of the States, taking form in customs barriers and other economic retaliation.' Farrand, Records of the Federal Convention, vol. II, p. 308; vol. III, pp. 478, 547, 548; The Federalist, No. XLII; Curtis, History of the Constitution, vol. 1, p. 502; Story on the Constitution, § 259. If New York, in order to promote the economic welfare of her farmers, may guard them against competition with the cheaper prices of Vermont, the door has been opened to rivalries and reprisals that were meant to be averted by subjecting commerce between the states to the power of the nation." 294 U. S., at 522.

To the argument that the law was in reality a health measure, since farmers must be protected from competition if they are to provide the reliable supply of healthful milk which the locality is entitled to have, the Court said,

> "Let such an exception be admitted, and all that a state will have to do in times of stress and strain is to say that its farmers and merchants and workmen must be protected against competition from without, lest they go upon the poor relief lists or perish altogether. To give entrance to that excuse would be to invite a speedy end of our national solidarity. The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the sev-

eral states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." 294 U. S., at 523.[9]

*Baldwin* was heavily relied upon in both *Du Mond* and *Dean, supra.* In *Du Mond,* New York was found to have no power under the Commerce Clause to forbid an out-of-state distributor from establishing additional processing plants and additional sources of milk within the State. In *Dean,* the City of Madison was prevented from reserving the Madison market to producers and distributors located within a specified distance of the city, although purported considerations of public health were advanced as justifying the restriction.

The principles of *Baldwin* are as sound today as they were when announced. They justify, indeed require, invalidation as a burden on interstate commerce of that part of the Florida regulatory scheme which reserves to its local producers a substantial share of the Florida milk market.

## II.

Under the controls challenged here, Polar must buy from its Florida producers, and pay 61 cents per gallon for it, an amount of raw milk equal to its Class I sales if it is available from these producers. If more than this

---

[9] In response to the argument that New York's price requirements were necessary to enhance the economic welfare of Vermont farmers and thereby ensure their observance of sanitary and health requirements, the Court stated that "the evils springing from uncared for cattle must be remedied by measures of repression more direct and certain than the creation of a parity of prices between New York and other states. . . . Whatever relation there may be between earnings and sanitation is too remote and indirect to justify obstructions to the normal flow of commerce in its movement between states." 294 U. S. at 524. See *Dean Milk Co.* v. *Madison,* 340 U. S. 349, where a purported local health measure was invalidated because reasonable nondiscriminatory alternatives, adequate to conserve and protect local interests, were available.

amount is offered, Polar must also take the surplus at the lower established prices. And these obligations continue to bind Polar even though both its Class I needs and the surplus obtainable from Florida producers may steadily increase. Polar obviously will not and cannot use outside milk for those uses for which it is required to use Florida milk. Polar may turn to out-of-state sources only after exhausting the supply offered by its Pensacola producers. Under the challenged regulations, an Alabama dairy farmer could not become one of Polar's regular producers and sell all of his milk to that company. Since he could not share in the Class I market—Pensacola producers are probably able to supply that market—his milk could command only the lower prices applicable to the less remunerative uses, prices which would not cover his cost of production.[10]

The consequences for interstate commerce are clear. In *Baldwin* New York's price control removed any economic incentive for a local distributor to purchase out-of-state milk and thereby encouraged its distributors first to consume the local supply of milk before turning to out-of-state sources. Out-of-state milk was denied an equal opportunity to compete with New York-produced milk to the extent that the out-of-state supply bore additional transportation charges. The Florida controls preempt for the Florida producers a large share of the Florida market, especially the most lucrative fluid milk market. Out-of-state milk may not participate in this part of the Florida market, unless local production is inadequate, and given the exclusive domain of the Florida producers over Class I sales, out-of-state milk may not profitably serve the re-

---

[10] The Florida Milk Commission has informed us that Florida producers would operate at a loss unless a proportion of their sales of milk were put to Class I use and that therein lies the purpose of the Class I purchase and allocation requirement. We do not see why the situation is different for non-Florida producers.

mainder of the Florida market, since it is relegated to the surplus market alone. These barriers are precisely the kind of hindrance to the introduction of milk from other States which *Baldwin* condemned as an "unreasonable clog upon the mobility of commerce. They set up what is equivalent to a rampart of customs duties designed to neutralize advantages belonging to the place of origin. They are thus hostile in conception as well as burdensome in result." 294 U. S., at 527.

The exclusion of foreign milk from a major portion of the Florida market cannot be justified as an economic measure to protect the welfare of Florida dairy farmers or as a health measure designed to insure the existence of a wholesome supply of milk. This much *Baldwin* and *Dean* made clear. Nor is it an escape from *Baldwin* to say that Polar has no interest in providing a satisfactory blend price as a basis for ongoing relationships with any out-of-state producer and that its only interest is in buying surplus milk at distress prices from out-of-state sources and selling it at Class I prices in the Florida market, all to the detriment of Florida producers and an orderly market. For this is but another assertion that a State may preempt its market for its own producers to the exclusion of production from other areas. Florida has no power "to prohibit the introduction within her territory of milk of wholesome quality acquired [in another State], whether at high prices or at low ones," 294 U. S. 521; the State may not, in the sole interest of promoting the economic welfare of its dairy farmers, insulate the Florida milk industry from competition from other States.

Florida, it is true, does not prevent distributors located in other States from selling wholesome fluid milk in the Florida market. But allowing competition on the distributor level is no justification for barring interstate milk from the most lucrative segment of Florida's raw milk

market. Given such distributor competition as there is,[11] there is still milk in other States which Polar can and wants to acquire and which it will not acquire in the face of the Florida regulations. The burden on commerce and the embargo on out-of-state milk remain.

The cases relied upon by the Commission do not save the regulatory scheme challenged here. *Nebbia* v. *New York*, 291 U. S. 502, established that minimum retail and wholesale prices for milk purchased and sold within the State do not offend the Due Process and Equal Protection Clauses. Nor is such price regulation an impermissible burden upon commerce, *Highland Farms Dairy* v. *Agnew*, 300 U. S. 608, even as applied to a distributor who purchases and cools milk within the State and then transports it to another State for processing and sale, since the burden on commerce is indirect and only incidental to the regulation of an essentially local activity. *Milk Control Board* v. *Eisenberg Farm Products*, 306 U. S. 346. In

---

[11] A recent study of movement patterns of fluid milk and milk products in the Southeastern States indicates that the quantity of fluid milk and other products from Grade A milk moving across state lines within this area was relatively small, and that among six States in the area, North Carolina, South Carolina, Georgia, Alabama, Tennessee and Florida, Florida had by far the highest percentage of fluid milk and milk products distributed in the same areas as processed. This percentage was 95%. Carley and Purcell, Milk Movement Patterns In The Southeast, 44 (So. Coop. Series, Bull. 84, April 1962).

Another study during sample months of 1959 shows that Florida producers supplied 99.3% of the market for fluid milk in Florida; for all markets, local producer shipments were in excess of 90% of total milk supplies received and that the remainder in each area was obtained from sources located in other Florida markets. Only in northwest Florida did receipts from other States amount to 2.6% of supplies. In no other area was this amount above 1% of total receipts. R. E. L. Greene and H. W. Wurburton, An Economic Evaluation of Fluid Milk Supply, Movement and Utilization in Florida, 61 (Dept. of Agricultural Economics, Fla. Agricultural Experiment Station).

none of these cases was there any attempt to reserve a local market for local producers or to protect local producers from out-of-state competition by means of purchase and allocation requirements imposed upon milk distributors.

The power which we deny to Florida is reserved to Congress under the Commerce Clause, and we are offered nothing indicating either congressional consent to, or acquiescence in, a regulatory scheme such as Florida has employed. On the contrary, under the present Act authorizing federal marketing orders in the milk industry, such an order may not "prohibit or in any manner limit, in the case of the products of milk, the marketing . . . of any milk or product thereof produced in any production area in the United States." This provision, as the Court explained in *Lehigh Valley Coop.* v. *United States*, 370 U. S. 76, was intended to prevent the Secretary of Agriculture from setting up trade barriers to the importation of milk from other production areas in the United States. We seriously doubt that Congress, in denying the power to the Secretary, thereby granted it to the States.

### III.

We turn to the matter of Polar's sales to United States military reservations. Florida does not purport to regulate the price which Polar must charge for milk sold to the Government on or off military bases. Florida regulates only the price which Polar must pay for its milk, not what it must sell it for. Since the holding in *Paul* v. *United States*, 371 U. S. 245, dealt only with the conflict between federal procurement regulations and a State's attempt to prescribe the prices which a distributor must charge for milk sold to the United States, it is not applicable here. Likewise, because Florida regulates only producer prices applicable to sales made by producers to the distributor, none of which occur on military bases, its law is not vulnerable as an attempt to legislate with regard

to transactions occurring within federal enclaves subject to the exclusive jurisdiction of the United States. Cf. *Standard Oil* v. *California,* 291 U. S. 242, and *James* v. *Dravo Contracting Co.,* 302 U. S. 134.

However, in the *Paul* case the United States initially attacked California's producer prices, along with its distributor prices, as in conflict with federal procurement regulations, an issue which was abandoned in this Court and which was expressly saved in the Court's opinion. It is that issue which Polar now presents to us.

For good reason we again put off decision of this question to another day. At the outset of this litigation, the trial court temporarily enjoined the application to Polar of a Milk Commission order establishing prices to be paid Florida producers for milk to be sold to military installations and requiring purchases of such milk from designated producers. That order, however, was voted down by the Pensacola producers, leaving considerable confusion, amply demonstrated by the record before us, concerning the status of so-called military milk under the outstanding orders of the Commission. It would seem— although we are not sure, and there were no findings below about these matters—that military milk is Class I milk but that Polar nevertheless need not use Pensacola milk for military sales and is free to purchase out-of-state milk for this purpose, although if it does use milk purchased from its earned-base producers, it must pay 61 cents per gallon for it. It was apparent from the oral argument that Polar and the Commission were in dispute as to the impact of the existing regulations upon military sales, and we would hesitate to adjudicate the issue tendered in the absence of more helpful testimony and additional consideration of the matter in the court below, particularly since it is not at all clear that Polar has been using Pensacola milk for its military sales, or even that it wants to in the future. If it is free to utilize outside

milk, acquired at whatever price, it may not want to pursue the matter at all. Besides, Polar is obtaining a substantial percentage of its total needs from outside the State and the production of Polar's Pensacola producers may be wholly exhausted by other, nonmilitary, uses to which it may be put.

Moreover, consideration of the possible impact of producer-pricing systems upon federal procurement regulations may be premature at this time, in view of our invalidation of other provisions of the Florida law, provisions not entirely unrelated to the issue of military milk. The whole problem of military sales may take on a different aspect upon remand of this case.

## IV.

Polar challenges that provision of the Florida Milk Control Act which imposes a tax in the amount of 15/100 of 1 cent upon each gallon of milk distributed by a Florida distributor. To the extent the computation of the tax includes milk which it sells to Fort Benning, Tyndall Air Force Base, and the Pensacola Naval Air Station, all being federal enclaves over which the United States exercises exclusive jurisdiction, Polar argues that the taxing measure is invalid as beyond the jurisdiction of the State to impose. We do not agree.

Polar's reliance on *James* v. *Dravo Contracting Co.*, 302 U. S. 134, and *Standard Oil* v. *California*, 291 U. S. 242, is misplaced. The *James* case dealt with a 2% gross receipts tax levied upon every person engaging in the business of contracting within the State, as applied to a contractor undertaking construction of locks and dams for the United States in certain navigable streams. The Court denied West Virginia's jurisdiction to assess a gross-receipts tax with respect to work done by the contractor at its plants in Pennsylvania, as well as to work done within the exterior limits of West Virginia on property over which the

United States had acquired exclusive jurisdiction. In *Standard Oil* v. *California,* California undertook to lay an excise tax upon every gasoline distributor for each gallon of motor vehicle fuel "sold and delivered by him in this State." The Court found the tax invalid where both sale and delivery occurred within the boundaries of the Presidio of San Francisco, a federal enclave over which the United States exercised exclusive jurisdiction.

In these cases the tax was deemed to fall upon the facilities of the United States or upon activities conducted within these facilities, the principle of both cases being that there was nothing occurring within the State, beyond the borders of the federal enclave, to which the tax could attach. Contrariwise, the Florida tax is on the privilege of engaging in the business of distributing milk or acting as a distributor; a distributor is defined as "any milk dealer who operates a milk gathering station or processing plant where milk is collected and bottled or otherwise processed and prepared for sale." Fla. Stat. § 501.02. The incidence of the tax appears to be upon the activity of processing or bottling milk in a plant located within Florida, and not upon work performed on a federal enclave or upon the sale and delivery of milk occurring within the boundaries of federal property. *Standard Oil* and *Dravo* do not reach this case, for the activity Florida taxes—the processing or bottling of milk—occurs at Polar's plant prior to the sale and delivery of milk to the Government.[12]

---

[12] It may be that the economic burden of the tax ultimately falls upon purchasers of Polar's milk, including the United States. Decisions of this Court make clear, however, that the fact that the economic burden of a tax may fall on the Government is not determinative of the validity of the tax. As was said in respect to a sales tax applied to materials, the cost of which the Government was obliged to pay:

"The Government, rightly we think, disclaims any contention that the Constitution, unaided by Congressional legislation, prohibits a tax

It may be urged that a distributor is a dealer [13] and that a dealer is one who sells milk, including one who sells to and upon federal enclaves. But even so, distributing has, by definition, its processing dimension, a substantial activity occurring within Florida. This is enough to sustain the tax. Besides, 4 U. S. C. § 105, enacted subsequent to *James* and *Standard Oil, supra,* confers upon the States jurisdiction to levy and collect a sales or use tax "in any Federal area," and a sales or use tax is defined as "any tax levied on, with respect to, or measured by, sales . . . of tangible personal property . . . ." 4 U. S. C. § 110. We think this provision provides ample basis for Florida to levy a tax measured by the amount of milk Polar distributes monthly, including milk sold to the United States for use on federal enclaves in Florida.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

exacted from the contractors merely because it is passed on economically, by the terms of the contract or otherwise, as a part of the construction cost to the Government. So far as such a non-discriminatory state tax upon the contractor enters into the cost of the materials to the Government, that is but a normal incident of the organization within the same territory of two independent taxing sovereignties. The asserted right of the one to be free of taxation by the other does not spell immunity from paying the added costs, attributable to the taxation of those who furnish supplies to the Government and who have been granted no tax immunity." *Alabama* v. *King & Boozer,* 314 U. S. 1, 8–9.

[13] Fla. Stat. § 501.02 provides:

" 'Milk dealer' means any person who purchases or handles milk within the state, for sale in this state, or sells milk within the state in any market as defined in this chapter. Each corporation which if a natural person would be a milk dealer within the meaning of this chapter, and any subsidiary of such corporation, shall be deemed a milk dealer within the meaning of this definition. A producer who delivers milk only to a milk dealer shall not be deemed a milk dealer."