STATE OF MISSISSIPPI EX REL. JOE T. PATTERSON, ATTORNEY GENERAL *v.* PURE VAC DAIRY PRODUCTS CORPORATION

No. 43228          December 18, 1964          170 So. 2d 274

*John L. Hatcher,* Special Assistant Attorney General, Jackson, for appellant.

*Martin, Tate & Morrow, W. Emmett Marston,* Memphis, Tenn.; *Carter & Mitchell,* Jackson, for appellee.

Lee, C. J.

The State of Mississippi ex rel Joe T. Patterson, Attorney General, acting for and on behalf of Si Corley, Commissioner of Agriculture and Commerce of the State of Mississippi, filed a bill of complaint against Pure Vac Dairy Products Corporation, organized and existing under the laws of Tennessee, but doing business in Mississippi.

The allegations of the will set out the origin and continuance of this controversy as follows: Commencing in 1960 it was charged that the defendant, with a license to operate as a manufacturer and distributor of perishable milk products, began to ignore some of the statutory provisions relating to this matter. However, in 1961, after an alleged violation of Section 4560-108(c) Mississippi Code Annotated (Supp. 1962), the defendant agreed, under the provision of Section 4560-118(b) of said Code, to pay the costs and desist from any threatened violation. But the defendant, from January 1963, has continued to violate said provisions by selling such products in certain counties of the State at less than the established price therefor. In July 1963, the defendant filed with the Commissioner a revised schedule, listing prices of ice cream, ten percent butter fat, at $.85 per gallon, and ice milk at $.65 per gallon, to which would be added a small freight charge. Since those prices were below the prevailing prices in the affected areas, the Commission notified the defendant to comply with Section 4560-108(b) Mississippi Code Annotated (Supp. 1962), by furnishing the proof therein required.

The defendant refused to do so. It also refused to comply with the provisions of Section 4560-113 of the above stated Code, in failing to report the quantity of such perishable milk products, and notified the Commissioner, on August 8, 1963, that no such reports would thereafter be forthcoming. The defendant, in addition, refused to pay the fees and assessments prescribed, in violation of Section 4560-111 of the above stated Code.

The prayer of the bill was for the issuance of a writ, enjoining the defendant against violations of Sections 4560-111, 4560-113, 4560-108(c), Mississippi Code Annotated (Supp. 1962), and against refusal to comply with Section 4560-108(b) thereof by furnishing proof that its prices were not below costs, to be verified by the Commissioner.

The answer of the defendant substantially admitted the statement of facts, set out in the bill of complaint, but denied the effect and conclusions, allegedly made by the pleader in reaching the results as charged. It maintained that the sales, which it has made, were made and consummated in Memphis, Tennessee, and denied that such sales were in violation of the Milk Products Sales Act of Mississippi. It also denied that it has threatened to continue the alleged violations, and denied that its sales were subject to the Act. It pled that sales, since January 3, 1963, were contracts f.o.b. its docks in Memphis, Tennessee; that title was passed to the purchaser at that time; and that possession of the defendant became that of agent or bailee for the purchaser. It amended its answer to the effect that, if mistaken in the sufficiency of the foregoing defense, then, alternatively, the sales were in interstate commerce, regulated only by the Congress of the United States; and, if the Milk Products Sales Act is applied, it interferes with and constitutes a burden upon interstate commerce and is in violation of Article 1, section 8, Constitution of the United States.

The evidence showed that Pure Vac Dairy Products Corporation is a Tennessee corporation, with its only plant located in Memphis, Tennessee. It has no plants in Mississippi. Prior to 1963, its mode of operation in the sale of ice cream, ice milk and novelty items, in Mississippi, was through route salesmen, transporting the products in trucks and calling on retail stores, taking orders, and selling the products from the trucks. These salesmen would also look over the stocks in the stores and make recommendations as to quantities of various items to be purchased. In other words, this mode of doing business was a pure peddling operation.

In 1963, the corporation discontinued that kind of operation, and adopted, what it denominates as its f.o.b. dock, Memphis, Tennessee, prices. Under that practice, its prices were listed at $.80 per gallon for ice cream and $.60 per gallon for ice milk, with special charges added for delivery. In a 50 mile radius, this charge was $.02 per gallon; in 150 miles, $.03; and in 300 miles, $.04. (The total cost to the purchaser was approximately $.20 a gallon less than the established prices in Mississippi.) Orders could be made by mail or by telephone, even collect. It was claimed that the orders were accepted in Memphis, Tennessee, the specific order filled and loaded separately in refrigerated trucks, owned or rented by the corporation, and driven by employees of the corporation from its dock to the dock of the customer's store, where the goods were unloaded by the customer. But the corporation was neither a common nor contract carrier. It had no permit from either the Public Service Commission of Mississippi or the Interstate Commerce Commission. The ordered products were under the control of the corporation from its docks to the customer's dock. The driver took his orders from his manager, the Secretary-Treasurer of the corporation, who could stop his truck on the route, if it could be located, and divert it wherever such officer desired.

The corporation was acting in a dual capacity, both as manufacturer and as hauler, but it said that title passed at the dock at Memphis and the products were delivered from Pure Vac, the manufacturer, to Pure Vac, as hauler. It appeared that Pure Vac was to bear the loss for damage in transit, but it must have done so as distributor because it replaced the goods, and did not pay for the damage in money. The defense said that it was an economic advantage to make the deliveries at particular times and haul only merchandise which had been previously ordered. The Commissioner has, in no way, tried to change the corporation's method of doing business.

The learned chancellor, after a hearing, in a written opinion, declined to issue the injunction, and dismissed the bill. From the decree entered, the Commissioner appealed.

On appeal, the same questions again arise, that is, whether the sales were fully consummated in Memphis, Tennessee, and whether the application of The Milk Products Act constitutes a burden on interstate commerce.

By Mississippi Laws 1960, chapter 155, section 4560-141, et seq., Mississippi Code Annotated (Supp. 1962), the Legislature invoked the police powers of the state in the creation of the Mississippi Milk Commission. The title of the chapter was designated as "An Act to create a commission designated as the Mississippi Milk Commission to supervise and regulate the production, transportation, storage, distribution, and sale of fluid milk and to regulate the dairy industry; to provide for the licensing of producer distributors, dealers or handlers, and retail stores dealing in fluid milk; to regulate and fix minimum prices for fluid milk at the producer level, and minimum and maximum prices at the wholesale and retail levels; to provide for the raising of funds for the administration of this act and defraying the cost

and expenses thereof; to impose penalties for the violation of the act and rules and regulations lawfully issued thereunder; \* \* \* and for other purposes."

Mississippi Laws 1960, chapter 155, section 15; Mississippi Code Annotated section 4560-155(a) through (1) (Supp. 1962), contains a detailed method of designating marketing areas, and fixing prices for milk, upon public hearings and evidence, in which all persons in interest, the general public, and any persons whatsoever could testify.

After such hearings, the Commission can fix the prices of milk, in its various forms, both in the original condition after obtained from the cow and through the various stages to, and including, its ultimate grades and states of development. The orders of the Commission, issued thereon, are presumed to be correct; but appeals are allowed as a matter of right. By Mississippi Code Annotated section 4560-157 (Supp. 1962), the Commission was authorized to make, promulgate, and enforce reasonable rules, covering fair trade practices.

The constitutionality of this Act was upheld in the case of Mississippi Milk Commission v. Vance, 240 Miss. 814, 129 So. 2d 642 (1961).

The Milk Products Sales Act, chapter 156, Laws 1960, sections 4560-101, et seq., Mississippi Code Annotated (Supp. 1962), bore the following title: "An Act to assure a full supply of fresh milk products at competitive prices and to prevent unfair competition and unfair trade practices in the sale of perishable fresh milk products; to prevent the sale of perishable fresh milk products below cost; to prevent discrimination in prices and services which injure competitors or destroy or substantially lessen competition; to provide remedies and impose penalties for violations of this Act; to provide for the raising of funds for the administration and enforcement thereof and to repeal chapter 134, Laws of 1956, and chapter 137, Laws of 1958, the same being

the Unfair Milk Sales Act, as amended; and for other purposes.''

Section 2 of said chapter, section 4560-102, Mississippi Code Annotated (Supp. 1962) provides as follows: ''STATEMENT OF LEGISLATIVE POLICY. It is hereby declared to be the legislative intent to encourage fair and honest competition and to safeguard the public against unfair, unjust, disruptive, demoralizing, and fraudulent business practices existing in transactions involving the sale of, offer to sell, or inducement to sell perishable fresh milk products in the wholesale and retail trades in this state. The policy of the state is to promote the general welfare through the prohibition of unfair competition and unfair trade practices or sale within the State of Mississippi by any person of perishable fresh milk products below cost with the intent or with the effect of injuring competitors or destroying or substantially lessening competition, the purpose of this act being to carry out that policy in the public interest.''

Section 4 of the above chapter, section 4560-104 Mississippi Code Annotated (Supp. 1962), provides as follows: ''UNFAIR TRADE PRACTICES AND SALE BELOW COST UNLAWFUL. It shall be unlawful for any person with intent or with the effect of injuring competitors, or destroying or substantially lessening competition to engage in unfair trade practices or to offer for sale, advertise for sale, or sell within the State of Mississippi, either at wholesale or retail, fresh milk products at less than the cost of same as provided herein to the person manufacturing or selling same, provided that such offer for sale, advertisement for sale, or sale may be made for the purpose of meeting a competitive price at which same may be offered for sale, advertised for sale, or sold by a competitor within any trade territory wherein said competitive price may be used by a competitor. The advertising for sale of perishable fresh

milk products below cost except to meet a competitive price substantiated as provided herein shall be prima facie evidence of an unfair trade practice.''

Section 4560-106, Mississippi Code Annotated (Supp. 1962) gives the method in detail for the determination of the basic cost of milk.

Section 4560-107 of said Code denominates thirteen different trade practices as unfair.

Section 4560-108(e) of said Code requires the manufacturer or distributor to file with the commission, on forms to be furnished by the Commissioner, the current wholesale price for perishable milk products, etc., to be sold by it. Subsection (b) thereof is the provision for the change or withdrawal of the above mentioned price schedule until notice, as required, is furnished to the commissioner. If the price is below those prevailing in the area, he must then furnish proof that the prices are not below his cost of production.

██ ■ Necessarily, the time and place of the sale of property must be determined by the intention of the parties. 2 Williston, Sales section 261 (1948). Section 263, *Ibid.,* at pages 12-13, cites section 19 of the Uniform Sales Act and sets out certain rules for ascertaining the intention of the parties. For instance, it says in part: ''Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer: * * *

''Rule 5. — If a contract to sell requires the seller to deliver the goods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not pass until the goods have been delivered to the buyer or reached the place agreed upon.''

''This rule states the doctrine of the common law.'' 2 Williston, Sales section 279a, at page 87.

█ ██ Of course, if the shipments were made by common or contract carrier, the placing of the same in the hands of such a carrier, f.o.b. its equipment at Memphis, would constitute delivery to such carrier as agent for the consignee. Powell v. Aldridge, 202 Miss. 648, 32 So. 2d 146 (1947), and the many authorities there cited. See also Southern Creosoting Co. v. Whitfield, 130 Miss. 476, 94 So. 452 (1922). ██ █ The statement of facts, heretofore given, shows that the perishable products, manufactured by, and in the hands of, Pure Vac were delivered to neither a contract nor a public carrier; that they were transported in trucks, over which Pure Vac exercised control, and which were operated by Pure Vac employees; and that they were delivered in that manner to the dock of the purchaser. Besides, two of the customers of Pure Vac testified that, if there was damage in transit, Pure Vac did not pay for the damage in money, but simply replaced the damaged merchandise. This fiction of duality is an insufficient basis on which to declare that possession was delivered in Tennessee. The delivery was actually effected in Mississippi as the products were carried to the customers' docks for them to receive. There seems to be no substantial difference in fact between the peddling operation, first employed by Pure Vac, and the one which has now supplanted it. Consequently, the appellee should conform to the provisions of the Act.

██ █ It is a proper exercise of the police power of the state, under the Milk Products Sales Act, to regulate the prices at which such products, delivered and sold in Mississippi, may be sold. The sale of the milk products is one consummated in Mississippi and not in Tennessee. ██ █ In either event, however, the regulation concerns interests which are peculiarly local, and does not infringe the national interest in maintaining freedom of commerce across state lines. It is not an unreasonable interference with national interests, but

the protection of a legitimate local interest, the prevention of unfair competition, and the maintenance of minimum prices for sales made in this state, in this industry vitally affecting the health and public welfare of the state.

The leading article on this subject, which has affected many subsequent Supreme Court decisions, is by Noel T. Dowling, Interstate Commerce and State Power, 27 Va. L. Rev. 1 (1940). Under current doctrine, the validity of a state law depends upon a balancing of the national and local interests affected, and upon the nature and extent of the burden, if any, which the law imposes on interstate commerce. See South Carolina State Highway Department v. Barnwell Brothers, 303 U. S. 177, 58 S. Ct. 510, 82 L. Ed. 734 (1938); and California v. Zook, 336 U. S. 725, 69 S. Ct. 841, 93 L. Ed. 1005 (1949). See also Stern, The Scope of the Phrase Interstate Commerce, 41 A.B.A.J. 823, 871 (1955).

The record reflects a genuine local need for regulation of minimum prices in a local industry. It is not sound policy to deny the state power to protect itself from unregulated competition, particularly under the ''balancing'' standard, in sales completed in this state, with the seller delivering the product to retailers in Mississippi.

The case of Baldwin v. G.A.F. Seelig, Inc., 294 U. S. 511, 55 S. Ct. 497, 79 L. Ed. 1032, 101 A.L.R. 55 (1935), appears not to be controlling in the present case. It held invalid that part of the New York Milk Control Act which prohibited the sale in New York of milk produced and bought outside the state at a price lower than the minimum for similar purchases within the state. The appellant there purchased milk from Vermont producers at less than the permissible minimum in New York. The court held, in effect, that New York could not regulate the prices paid producers out of the state. The commission, in the present instance, does not pro-

pose to do that, but only to regulate the price charged for milk products sold in Mississippi. The same deficiencies condemned in the Seelig case existed in Polar Ice Cream & Creamery Co. v. Andrews, 375 U. S. 361, 84 S. Ct. 378, 11 L. Ed. 2d 389 (1964). There Florida sought to require a Florida milk processor to allocate its milk purchases for four classes of milk among Florida producers, although the Polar Company had purchased in the past seventy percent of its milk from out-of-state producers. The court followed the principles of the Baldwin case. But the Polar case is likewise distinguishable, because there Florida was seeking to exclude foreign milk from a major portion of the Florida market.

Mississippi, in the present instance, is not seeking to do anything of that nature. The commission's purpose is simply to protect primary local interests in relation to the minimum prices of milk sold in this state. No discrimination is effectuated against Pure Vac, because it has the same right as Mississippi producers to sell in the Mississippi market, subject to minimum prices, unless Pure Vac can show that it can produce and sell at a lesser price than Mississippi producers, and still operate at not less than cost. The burden is on Pure Vac to establish the latter fact.

The decision in Milk Control Board, etc. v. Eisenberg Farm Products, 306 U. S. 346, 59 S. Ct. 528, 83 L. Ed. 752 (1939), applied the doctrine which governs this case. Pennsylvania's regulations for license, bond, and price were held valid in their application to a New York dealer, operating in Pennsylvania, and purchasing milk in that state for delivery to New York.

In County Board of Arlington County, Va. v. State Milk Commission, 346 U. S. 932, 98 L. Ed. 423 (1954), the Supreme Court of the United States in a per curiam decision, cited the Eisenberg case, supra, as authority for so doing. While the facts were not stated therein,

presumably there must have been considerable factual the belief that the United States Supreme Court at this time, continues to apply the Eisenberg principle and would uphold the present state regulations.

As heretofore stated, there was no substantial issue on the facts. The questions arose simply for a construction of those facts, and the application of the law to them. Thus the trial court and this Court stand on an equal footing in determining the application of the law to the factual situation. It is the opinion of this Court, for the reasons stated, that the learned chancellor misconstrued the effect of the principles of the law, which govern this case; and that the temporary injunction, as prayed for in the bill of complaint, should have been granted. It therefore follows that the decree of the trial court must be, and it is, reversed, and the cause is remanded to that court for further proceedings, consistent with the views herein expressed.

Reversed and remanded.

All Justices concur.