**MARIGOLD FOODS, INC., Schroeder Milk Company, Inc., George Benz & Sons d/b/a Oak Grove Dairy, Ellsworth Cooperative, Creamery, Inc., Plaintiffs,**

v.

**Elton REDALEN, as Commissioner of the Minnesota Department of Agriculture, Defendant.**

Civ. No. 4–92–1084.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 23, 1992.

716

Steven J. Rosenbaum, Andrew I. Schoenholtz, Covington and Burling, Washington, DC, Michael A. Stern, and Fredrikson & Byron, P.A., Minneapolis, MN, for plaintiffs.

Hubert H. Humphrey III, Minnesota Atty. Gen., Scott R. Strand, Asst. Minnesota Atty. Gen., Paul A. Strandberg, John K. Lampe, Sp. Asst. Minnesota Attys. Gen., St. Paul, MN, for defendant.

## ORDER

DOTY, District Judge.

This matter is before the court on the plaintiffs' motion for a preliminary injunction. Based on a review of the file, record and proceedings herein, the court grants the plaintiffs' motion.

## BACKGROUND

The parties do not dispute the facts underlying this case. Since 1937, the price of raw milk has been extensively regulated by the federal government pursuant to the Agricultural Marketing Agreement Act ("Act"), 7 U.S.C. § 608c. Pursuant to § 608c, the federal government promulgates regulations that establish orderly marketing conditions and set minimum prices for milk purchased from dairy farmers. As part of the pricing system, the federal government classifies milk according to the form in which it is used. 7 U.S.C. § 608c(5)(A). Generally, milk is divided into three classes of utilization: Class I primarily includes bottled milk, Class II includes soft milk products such as yogurt, ice cream and cottage cheese and Class III includes hard milk products such as butter, dry milk powder and certain hard cheeses. Each class is assigned a specific minimum price. Class I milk has the highest price and Class III milk has the lowest price. Under the pricing system devised by the federal government, the minimum price for each class of milk can fluctuate each month.

Despite the minimum price that dairy farmers receive for their milk under federal law, dairy farmers located in the State of Minnesota ("Minnesota") have encountered difficult financial times in recent years and many of Minnesota's dairy farmers have gone out of business. In an attempt to help Minnesota's dairy farmers, the Minnesota legislature recently enacted a law ("Minnesota law") to establish "an over-[the-federal-]order premium milk price [that] will benefit the incomes of all Minnesota dairy farmers and improve the economies ·in rural communities." *See* Minn. Stat. 32A.071. The Minnesota law provides that the price paid by dairy processors located in Minnesota ("Minnesota dairy processors") for Class I milk shall not be less than $13.20 per hundredweight.

On November 4, 1992, the defendant, the Commissioner of the Minnesota Department of Agriculture ("Commissioner"), released regulations implementing the Minnesota law. The regulations provide that in any month the federal minimum price falls below $13.20 per hundredweight of Class I milk, Minnesota dairy processors must pay the difference between the federal minimum price per hundredweight of Class I milk and the $13.20 minimum price set by Minnesota. The amount by which $13.20 exceeds the Federal minimum price is referred to as the "Minnesota premium." In months when the federal minimum price falls below $13.20 per hundredweight, the price of Class I milk purchased from dairy farmers located in Minnesota ("Minnesota dairy farmers") is likely to be higher than the price of Class I milk purchased from farmers in other states. To protect Minnesota dairy farmers from competition during those months, the regulations also require Minnesota dairy processors to pay the Minnesota premium on. Class I milk purchased from dairy farmers located in states other than Minnesota ("out-of-state dairy farmers"). Finally, the regulations, using a complex allocation formula, require that the Minnesota premium be paid only to Minnesota dairy farmers even if Minnesota dairy processors pay the Minnesota premium on Class I milk purchased from out-of-state dairy farmers.

The plaintiffs [1] contend that the Minnesota law and the regulations implementing that law (together "the Minnesota law") violate the Commerce Clause of the United States Constitution ("Commerce Clause") by establishing a minimum price that must be paid by Minnesota dairy processors on Class I milk purchased from out-of-state dairy farmers.[2] The plaintiffs contend that the minimum price has been imposed to protect Minnesota dairy farmers from out-of-state competition and that such protectionism violates the Commerce Clause. The plaintiffs also contend that the Commissioner's actions infringe on their rights under the Commerce Clause in violation of 42 U.S.C. § 1983. The plaintiffs thus seek a preliminary injunction enjoining the Commissioner from attempting to enforce the Minnesota law requiring Minnesota dairy processors to pay the Minnesota premium or any other minimum price on Class I milk purchased from out-of-state dairy farmers.[3]

The Commissioner contends that the court cannot consider the plaintiffs' claims because the Minnesota premium is a tax on Class I milk utilization and the court lacks subject matter jurisdiction over the plaintiffs' claims under the Tax Injunction Act, 28 U.S.C. § 1341. The Commissioner also contends that the principal of comity prevents the court from exercising jurisdiction over the plaintiffs' claims. In the alternative, the Commissioner contends that even if the court determines that it has jurisdiction over the plaintiffs' request for a preliminary injunction, application of the Minnesota premium does not violate the Commerce Clause because the Minnesota

premium applies equally to the purchase of Class I milk from in-state and out-of-state dairy farmers and does not burden interstate commerce.

## DISCUSSION

### A. Tax Injunction Act

■ The Commissioner contends that the court cannot consider the plaintiffs' claims because the Minnesota premium is a tax on Class I milk utilization and the Tax Injunction Act bars the court from considering motions to enjoin the collection of a tax imposed by the state. The Tax Injunction Act prohibits federal courts from exercising jurisdiction over certain claims involving state taxation. *Burris v. City of Little Rock*, 941 F.2d 717, 720 (8th Cir.1991). The Tax Injunction Act provides that:

> The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such state.

28 U.S.C. § 1341. The prohibition extends to suits for injunctive relief and to § 1983 claims in which a plaintiff seeks an injunction. *Burris*, 941 F.2d at 720 (citations omitted). The plaintiffs in this case have filed such claims. The court thus must determine whether the Commissioner's characterization of the Minnesota premium as a tax is correct. If the court determines that the Minnesota premium is a tax, it must then determine whether state law affords a "plain, speedy and efficient reme-

---

**1.** Plaintiffs Marigold Foods, Inc. ("Marigold Foods"), Schroeder Milk Company, Inc. ("Schroeder Milk") and Oak Grove Dairy ("Oak Grove") are Minnesota dairy processors that operate bottled milk processing plants located in Minnesota. Marigold Foods purchases raw milk from dairy farmers in Minnesota and Wisconsin. Schroeder Milk purchases raw milk from dairy farmers located in Minnesota, Wisconsin and Iowa. Oak Grove purchases raw milk from Minnesota dairy farmers.

Plaintiff Ellsworth Cooperative ("Ellsworth") is an agricultural cooperative located in Wisconsin. On behalf of its approximately 400 members, most of whom are located in Wisconsin, Ellsworth sells raw milk, to among others, two bottled milk processors located in Minnesota.

**2.** The plaintiffs do not contest the requirement that Minnesota dairy processors pay the Minnesota premium on Class I milk purchased from Minnesota dairy farmers.

**3.** The preliminary injunction that the plaintiffs seek relates only to the claims asserted in Counts I and II of their complaint. Those claims arise under the Commerce Clause and 42 U.S.C. § 1983. The plaintiffs do not seek a preliminary injunction with respect to the claim asserted in Count III of their complaint, which arises under the Supremacy Clause of the United States Constitution.

dy." If the court determines that the Minnesota premium is not a tax, its jurisdictional inquiry ends and it can consider the plaintiffs' request for relief.

■ Whether the Minnesota premium is a tax is a federal question and the label given by the state is not dispositive of the court's inquiry. *Wright v. McClain*, 835 F.2d 143, 144 (6th Cir.1987) (citing *Robinson Protective Alarm Co. v. City of Philadelphia*, 581 F.2d 371, 374–76 (3d Cir. 1978)). To determine whether the Minnesota premium is a tax, the court must look to the purpose underlying the premium. *Id.* at 145 (citations omitted); *Miami Herald Publishing Co. v. City of Hallandale*, 734 F.2d 666, 670 (11th Cir.1984) (citations omitted). Premiums imposed primarily for revenue-raising purposes are considered to be taxes. *Wright*, 835 F.2d at 145; *Miami Herald*, 734 F.2d at 670. Premiums primarily imposed for regulatory or punitive purposes, even though they may also raise revenues, generally are not considered to be taxes. *Miami Herald*, 734 F.2d at 670; *see also American Petrofina Co. of Texas v. Nance*, 859 F.2d 840, 841 (10th Cir.1988) (" 'The mere fact a statute raises revenue does not imprint upon it the characteristics of a law by which the taxing power is exercised.' " (citation omitted)).

■ Applying those standards, the court finds that the Commissioner's characterization of the Minnesota premium as a tax is incorrect. The Commissioner's argument that the Minnesota law exacts a tax because it imposes the Minnesota premium on the purchase of Class I milk in order to raise revenue for a dairy farmer assistance program is not persuasive. The Minnesota law is regulatory in nature. It primarily regulates the price Minnesota dairy processors pay for Class I milk. The fact that the Minnesota law also raises revenue is not dispositive of the issue of whether the Minnesota premium is a tax. *American Petrofina*, 859 F.2d at 841. The court thus concludes that the Minnesota premium is not a tax and the Tax Injunction Act does not prevent the court from exercising jurisdiction over the plaintiffs' claims.

■ The Commissioner argues that even if the court concludes that the Minnesota premium does not fall within the scope of the Tax Injunction Act, the court nevertheless should decline to consider the plaintiffs' claims under the principle of comity. The Commissioner relies on *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981), to support his argument. In *Fair Assessment*, the Supreme Court held that "taxpayers are barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts." *Id.* at 116, 102 S.Ct. at 186. The court finds that the Commissioner's reliance on *Fair Assessment* is misplaced. The court has determined that the Minnesota law does not exact a tax. Therefore, the plaintiffs' claims do not challenge the validity of a state tax. The court thus concludes that it can exercise jurisdiction over the plaintiffs' claims and consider the merits of their request for injunctive relief.

B. *Preliminary Injunction*

■ The court considers four factors in determining whether to grant the plaintiffs' motion for a preliminary injunction:

1. Is there a substantial threat that the plaintiffs will suffer irreparable harm if relief is not granted;

2. Does the irreparable harm to the plaintiffs outweigh any potential harm that granting a preliminary injunction may cause the Commissioner;

3. Is there a substantial probability that the plaintiffs will prevail on the merits; and

4. The public interest.

*Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc). The court balances the four factors to determine whether a preliminary injunction is warranted. *Id.* at 113; *West Publishing Co. v. Mead Data Cent. Inc.*, 799 F.2d 1219, 1222 (8th Cir.1986). The plaintiffs bear the burden of proof concerning the four factors. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987).

### 1. The Threat of Irreparable Harm

 To meet this element, the plaintiffs must prove that harm will result without injunctive relief and the harm will not be compensable by money damages. Possible or speculative harm is not enough. The absence of such a showing alone is sufficient to deny a preliminary injunction. *Gelco,* 811 F.2d at 420; *Roberts v. Van Buren Pub. Sch.,* 731 F.2d 523, 526 (8th Cir.1984) (citations omitted).

 The court finds that the plaintiffs are likely to suffer harm if the court denies their request for injunctive relief and they ultimately prevail on the merits of their claims. Resolution of the merits of this lawsuit may take more than a year. Economic projections for 1993 indicate that the minimum federal price will fall below the minimum price set forth in the Minnesota law in at least 7 months of the year. Statistics from 1991 and 1992 suggest that if Minnesota dairy processors were to buy approximately the same amount of Class I milk from out-of-state dairy farmers in 1993 as they have in the recent past, Minnesota premium payments on that purchase of Class I milk could amount to millions of dollars. In 1991, Minnesota dairy processors purchased 240.3 million pounds of Class I milk from out-of-state dairy farmers.[4] If the Minnesota law had been in effect, Minnesota dairy processors would have paid the Minnesota premium during 8 months of 1991 and the premium would have risen as high as $1.98 per hundredweight during part of that year. From January 1, 1992, through August 31, 1992, Minnesota dairy processors purchased 186.4 million pounds of Class I milk from out-of-state dairy processors.[5] If the Minnesota law had been in effect in 1992, Minnesota dairy processors would have paid the Minnesota premium during at least 4 months of 1992 and during part of that period the premium would have risen as high as $1.02 per hundredweight. Al-

though the plaintiffs failed to provide the court with an estimated dollar amount of premiums that Minnesota dairy processors would have paid given the statistics for 1991 and 1992, even crude arithmetic computations indicate that Minnesota dairy processors would have paid millions of dollars in premiums on the purchase of Class I milk from out-of-state dairy farmers had the Minnesota law been in effect during those years.

Plaintiff Ellsworth Cooperative is also likely to suffer harm if the court denies the request for injunctive relief and the plaintiffs ultimately prevail on the merits of their claims. Ellsworth Cooperative is likely to suffer monetary damages because of its inability to increase sales to Minnesota dairy processors based upon the lower prices it would be able to offer but for the application of the Minnesota premium to the Class I milk it sells to Minnesota dairy processors.

The court further finds that the harm the plaintiffs are likely to suffer would be irreparable because it would not be compensable by money damages. The eleventh amendment to the United States Constitution would shield Minnesota from an action to recover the Minnesota premium payments made or damages incurred as a result of the enforcement of the Minnesota law. *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974).

Based on the foregoing discussion, the court concludes that the first factor of the *Dataphase* test, the threat of irreparable harm, weighs in favor of granting the plaintiffs' motion for a preliminary injunction.

### 2. The Balance of Harm Between the Parties

 The balance of harm must tip decidedly toward the plaintiffs to justify issuing a preliminary injunction. *See e.g., Gen-*

---

**4.** The 240.3 million pounds equals 13.8% of the total amount of Class I milk purchased by Minnesota dairy processors from dairy farmers in and outside of Minnesota.

**5.** The 186.4 million pounds equals 16.0% of the total amount of Class I milk purchased by Minnesota dairy processors from dairy farmers in and outside of Minnesota during the period of January 1, 1992, to August 31, 1992.

*eral Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 624 (8th Cir.1987). Injunctive relief is not appropriate if the hardship to the Commissioner, should the preliminary injunction be issued, outweighs the hardship to the plaintiffs, should the preliminary injunction be denied.

■■■ As previously discussed, the plaintiffs are likely to lose millions of dollars if the court denies their request for injunctive relief and the Minnesota law is later determined to be violative of the Commerce Clause. The plaintiffs contend that the Commissioner has failed to show that he will suffer some hardship that outweighs the harm they are likely to suffer.

The Commissioner contends that the plaintiffs are incorrect and that the balance of hardships tips decidedly in favor of leaving the Minnesota premium program in place until the merits of the case can be decided. The Commissioner argues that any incremental financial burden the plaintiffs will incur if an injunction is denied is insignificant compared to the irreparable harm Minnesota's dairy farmers and many of Minnesota's rural communities will suffer if the injunction is granted and the Minnesota law ultimately is upheld.

The court finds that the plaintiffs have failed to show that the balance of harm tips decidedly in their favor. Plaintiffs Marigold Foods, Oak Grove and Schroeder Milk are large dairy processors that set the price of their products. Therefore, they would likely be able to pass off any costs they might incur to consumers. Although plaintiff Ellsworth Cooperative might not as easily be able to pass off any loss incurred to their customers, Ellsworth Cooperative has proffered no evidence suggesting the extent of the loss it might suffer should the court deny the motion for a preliminary injunction.

Balanced against the harm to the plaintiffs is the harm to Minnesota's ability to raise revenue for its dairy farmer assistance program and to its dairy farmers and rural communities. The Commissioner, however, has failed to show that there are no other means by which Minnesota could fund its program if the court were to enjoin

the enforcement of the Minnesota law. The court thus is unable to determine the extent of the potential harm to the Commissioner. Therefore, the court rejects the Commissioner's argument that the balance of harm tips decidedly in his favor.

Based on the foregoing, the court concludes that the second factor of the *Dataphase* test, the balance of harm, does not weigh in favor of granting or denying the plaintiffs' request for a preliminary injunction.

3. The Likelihood of Success on the Merits

 a. Count I—Commerce Clause

■■■ The Commerce Clause " 'prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.' " *Wyoming v. Oklahoma,* — U.S. —, —, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992) (quoting *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 273–274, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988)). The court uses a two-tiered test to analyze state economic laws and regulations under the Commerce Clause. If a state statute directly regulates or discriminates against interstate commerce or if its effect is to favor in-state economic interests over out-of-state interests, the statute is "per se invalid" under the Commerce Clause, *Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 578–579, 106 S.Ct. 2080, 2083–84, 90 L.Ed.2d 552 (1986) (citations omitted), and the burden falls upon the state to justify the economic regulation in terms of its benefits to the state and the lack of nondiscriminatory alternatives that will accomplish the same goals. *Wyoming,* — U.S. at —, 112 S.Ct. at 801 (citation omitted). When the statute has only indirect effects on interstate commerce and regulates even handedly, the court must examine "whether the [s]tate's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Brown–Forman,* 476 U.S. at 579, 106 S.Ct. at 2084 (citing *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct.

844, 847, 25 L.Ed.2d 174 (1970)). Under either tier, "the critical consideration is the overall effect of the economic regulation on both local and interstate" commerce. *Id.*

Minnesota has a right to set minimum prices for milk produced and sold by dairy farmers located within its borders. *See Polar Ice Cream and Creamery Co. v. Andrews,* 375 U.S. 361, 378, 84 S.Ct. 378, 388, 11 L.Ed.2d 389 (1964) (citation omitted)); *H.P. Hood & Sons v. Du Mond,* 336 U.S. 525, 529–30, 69 S.Ct. 657, 660–61, 93 L.Ed. 865 (1949); *Farmland Dairies v. McGuire,* 789 F.Supp. 1243, 1251 (S.D.N.Y. 1992) (citations omitted). The plaintiffs do not challenge Minnesota's establishment of a minimum price that exceeds the federal minimum price for Class I milk produced in Minnesota. Rather, the plaintiffs object to the requirement that Minnesota dairy processors pay the Minnesota premium on Class I milk purchased from out-of-state dairy farmers. Essentially, the plaintiffs argue that the regulations are per se invalid under the Commerce Clause, because the requirement that they pay the Minnesota premium on Class I milk purchased outside of Minnesota amounts to an unconstitutional burden on interstate commerce. The plaintiffs assert that the major purpose of requiring them to pay the Minnesota premium on Class I milk purchased from out-of-state dairy farmers is to negate the economic advantage that out-of-state dairy farmers who sell their Class I milk for lower prices would otherwise have over Minnesota dairy farmers.

The Commissioner, relying on *Henneford v. Silas Mason Co.,* 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937), and its progeny, argues that the Minnesota law does not violate the Commerce Clause because imposition of the Minnesota premium on the purchase of all Class I milk equally burdens intrastate and interstate commerce. In *Henneford,* the Supreme Court held that a state can impose a tax on imported goods so long as the burden falls equally on intrastate and interstate commerce. 300 U.S. at 584, 57 S.Ct. at 527. The Commissioner contends that imposition of the Minnesota premium on the purchase of Class I milk

will not change the amount of Class I milk that Minnesota dairy processors purchase from out-of-state dairy farmers because it will make no economic difference to Minnesota dairy processors where the Class I milk originates. In essence, the Commissioner argues that imposition of the Minnesota premium, like the compensating use tax at issue in *Henneford* will only "level the playing field" between Minnesota dairy farmers and out-of-state dairy farmers.

The court finds that the Commissioner's reliance on *Henneford* and its progeny is misplaced. The court has already determined that the Minnesota premium is an economic regulation, not a tax. *Henneford* and its progeny do not stand for the proposition that the state can set a minimum price for goods crossing state lines. Further, even if *Henneford* and this case involved the same Commerce Clause issues, the facts underlying the cases are distinguishable. In *Henneford,* revenues from Washington State's sales tax and the compensatory use tax went to the general coffers of the state, not to the Washington retailers. The imposition of the use tax did not benefit Washington retailers, but rather removed the disadvantage caused by the Washington sales tax. Thus, as the Supreme Court found, the compensatory tax merely equalized the burdens on in-state and out-of-state retailers. *Id.* In this case, the Minnesota premium paid on the purchase of Class I milk, including Class I milk purchased from out-of-state dairy farmers, would be distributed only to Minnesota dairy farmers and not to out-of-state dairy farmers who sell their Class I milk to Minnesota dairy processors. Therefore, the Minnesota law does more than simply level the playing field. Under the Minnesota law, Minnesota dairy farmers would receive a higher price for their Class I milk and would be protected from suffering a corresponding reduction in sales. That protection would necessarily come at the cost of out-of-state dairy farmers with lower-priced Class I milk, because the incentive to Minnesota dairy processors to purchase such Class I milk is reduced or eliminated. Accordingly, the court rejects the Commissioner's contention that under *Hen-*

*neford* and its progeny, the Minnesota law does not violate the Commerce Clause.

The court finds that regulating the price that Minnesota dairy processors must pay for Class I milk purchased from out-of-state dairy farmers is a direct regulation on interstate commerce. *See e.g., Brown–Forman,* 476 U.S. at 582–83, 106 S.Ct. at 2085–86 (a state may not regulate the price to be paid for goods in other states (citations omitted)); *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 522, 55 S.Ct. 497, 500, 79 L.Ed. 1032 (regulations tending to "mitigate the consequences of competition between the states" constitutes direct regulation). Thus, because the Minnesota law directly regulates interstate commerce, the plaintiffs are likely to prevail on the merits of their claim unless the Commissioner can justify the Minnesota law "both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Wyoming,* —— U.S. at ——, 112 S.Ct. at 801 (citations omitted).

The Commissioner argues that imposing the Minnesota premium on Class I milk purchased from out-of-state dairy farmers is justified because the premiums collected will fund programs to help slow the loss of Minnesota's dairy farms and improve rural communities. Although the court sympathizes with the plight of the Minnesota dairy farmer, it finds that the Commissioner's purported justifications are not sufficient to overcome the burden that the Minnesota law imposes on interstate commerce. The justifications set forth by the Commissioner are already foreclosed by Supreme Court precedent. In *Baldwin,* the Supreme Court reviewed a New York regulation that forbid New York-licensed dealers from selling milk produced out-of-state in New York unless the dealers paid the out-of-state farmers New York's minimum price for milk. New York asserted that it enacted the statute to enhance the economic welfare of New York's farmers and to ensure "the maintenance of a regular and adequate supply of pure and wholesome milk; the supply being put in jeopardy when the farmers of the state are unable to earn a living income." 294 U.S. at

523, 55 S.Ct. at 500. The Court found that those purported purposes did not justify the burden imposed upon interstate commerce. *Id.* at 522–23, 55 S.Ct. at 500.

If New York, in order to promote the economic welfare of her farmers, may guard them against competition with the cheaper prices of Vermont, the door has been opened to rivalries and reprisals that were meant to be averted by subjecting commerce between the states to the power of the nation.

The argument has been pressed upon us, however, that the end to be served by the Milk Control Act is something more than the economic welfare of the farmers or of any other class or classes. The end to be served is the maintenance of a regular and adequate supply of pure wholesome milk; the supply being put in jeopardy when the farmers of the state are unable to earn a living income.... Price security, we are told, is only a special form of sanitary security; the economic motive is secondary and subordinate; the state intervenes to make its inhabitants healthy and not to make them rich. On that assumption we are asked to say that intervention will be upheld as a valid exercise by the state of its internal police power, though there is an incidental obstruction to commerce between one state and another. This would be to eat up the rule under the guise of an exception. Economic welfare is always related to health, for there can be no health if men are starving. Let such an exception be admitted, and all that a state will have to do in times of stress and strain is to say that its farmers and merchants and workmen must be protected against competition from without, thus they go upon the poor relief lists or perish altogether. To give entrance to that excuse would be invite a speedy end of our national solidarity. The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and

that in the long run prosperity and salvation are in union and not division.

*Id.; see also Polar Ice Cream,* 375 U.S. at 377, 84 S.Ct. at 387 (relying on *Baldwin* in finding that "[t]he exclusion of foreign milk from a major portion of the Florida market cannot be justified as an economic measure to protect the welfare of Florida dairy farmers or as a health measure designed to ensure the existence of a wholesome supply of milk. . . . [T]he State may not, in the sole interest of promoting the economic welfare of its dairy farmers, insulate the Florida milk industry from competition from other States."). In addition, the Commissioner proffers no evidence that other less burdensome means of raising revenue to support the dairy farmer program are not available. The court thus finds that the Commissioner has not met his burden of justifying the Minnesota law either by showing the benefits from the law or by demonstrating that no less burdensome alternative exists. The court thus concludes that the plaintiffs are likely to succeed on the merits of their claim that the Minnesota law is invalid under the Commerce Clause.

### b. Count II—Section 1983

The court also finds that the plaintiffs are likely to succeed on the merits of their claim that enforcement of the Minnesota law will deprive them of their rights under the Commerce Clause in violation of 42 U.S.C. § 1983. The plaintiffs' claim is brought against the Commissioner in his official capacity as Commissioner of the Minnesota State Department of Agriculture. The plaintiffs assert that the Commissioner has promulgated unconstitutional regulations and has indicated his intention to enforce those regulations.

Section 1983 provides:

Every person who, under color any statute, ordinance, regulation, custom or usage, of any State . . . subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Although suits for damages against state officials sued in their official capacity, as the commissioner is here, are barred by the Eleventh Amendment, violations of the Commerce Clause may constitute the basis of an action under 42 U.S.C. § 1983. *See Dennis v. Higgins,* 498 U.S. 439, ——, 111 S.Ct. 865, 872–73, 112 L.Ed.2d 969 (1991), (in holding that suits for violations of the Commerce Clause may be brought under § 1983, the Supreme Court stated that "the Commerce Clause of its own force imposes limitations on state regulation of commerce, and is the source of a right of action in those injured by regulations that exceed such limitations."); *see also Kentucky v. Graham,* 473 U.S. 159, 169 n. 18, 105 S.Ct. 3099, 3107 n. 18, 87 L.Ed.2d 114 (1985), ("[i]n an injunction or declaratory action grounded on federal law, the State's immunity can be overcome by naming state officials as defendants."). The court thus finds that the plaintiffs may maintain their § 1983 claim against the Commissioner in his official capacity. Further, given the court's conclusion that the plaintiffs are likely to succeed on the merits of their claim that the Minnesota law violates the Commerce Clause, the court concludes that the plaintiffs are likely to succeed on the merits of their claim against the Commissioner.

Based on the foregoing, the court finds that the plaintiffs have demonstrated that the third *Dataphase* factor, the likelihood of success on the merits, weighs in favor of granting an injunction.

### 4. The Public Interest

Minnesota residents have an interest in ensuring that Minnesota can raise sufficient revenue to assist Minnesota's economically distraught dairy farmers and help maintain the vitality of Minnesota dairy farmers and farm communities. The court finds, however, that such interests are outweighed by the public's interest in ensuring that farmers are able to participate in unfettered interstate competition as

guaranteed under the Commerce Clause. As Justice Jackson stated in *H.P. Hood:*

> Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his export, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality.

336 U.S. at 539, 69 S.Ct. at 665. The court thus concludes that the fourth *Dataphase* factor, the public interest, weighs in favor of granting the plaintiffs' motion for a preliminary injunction.

██ Based on the foregoing, the court concludes that the plaintiffs have satisfied their burden under *Dataphase* and injunctive relief is appropriate. The court notes that entry of a preliminary injunction will maintain the status quo until the constitutionality of the Minnesota law can be resolved. The preliminary injunction, however, will not take effect until the plaintiffs post a $200,000 bond. *See* Rule 65(c) of the Federal Rules of Civil Procedure.

Accordingly, IT IS HEREBY ORDERED that the Commissioner or any other person or organization shall:

1. Cease from enforcing or attempting to enforce Section 4 of Chapter 602 of the Laws of Minnesota 1992, and the rules and regulations promulgated thereunder, to require Minnesota dairy processors to pay the Minnesota premium or any other minimum price on Class I milk that they purchase from out-of-state dairy farmers, pending the final resolution of this matter; and

2. Cease from enforcing or attempting to enforce Section 4 of Chapter 602 of the Laws of Minnesota 1992, and the rules and regulations promulgated thereunder, by basing, in whole or in part, the payments to be made by Minnesota dairy processors to Minnesota dairy farmers or to the equalization fund upon the quantity of Class I milk that Minnesota dairy processors purchase from out-of-state dairy farmers, pending the final resolution of this matter.

IT IS FURTHER ORDERED that pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, the preliminary injunction will not take effect until the plaintiffs post a $200,000 bond approved by the court.