MARIGOLD FOODS, INC., Schroeder Milk Company, Inc., George Benz & Sons d/b/a Oak Grove Dairy, Ellsworth Cooperative Creamery, Inc., Plaintiffs,

v.

Elton REDALEN, Commissioner of the Minnesota Department of Agriculture, Defendant.

Civ. No. 4–92–1084.

United States District Court, D. Minnesota, Fourth Division.

Oct. 20, 1993.

---

4. Docket no. 89.

5. Docket no. 140.

Steven J. Rosenbaum, Andrew I. Schoenholtz, and Covington & Burling, Washington, DC, Michael A. Stern, and Fredrikson & Byron, Minneapolis, MN, for plaintiffs.

Hubert H. Humphrey III, Atty. Gen., and Scott R. Strand, Asst. Atty. Gen., St. Paul, MN, for defendant.

## ORDER

DOTY, District Judge.

This matter is before the court on plaintiffs' renewed motion for a preliminary injunction. Based on a review of the file, record and proceedings herein, the court grants plaintiffs' motion.

## BACKGROUND

Plaintiffs are dairy processors located in Minnesota and Wisconsin. Defendant is the Minnesota Commissioner of Agriculture ("the Commissioner") in his official capacity. These parties were before the court in 1992 on plaintiffs' original motion for a preliminary injunction enjoining the enforcement of Section 4 of Chapter 602 of the Laws of Minnesota (Minnesota Statutes Section 32A.071), which established a minimum price to be paid for Class I milk in Minnesota, irrespective of whether that milk was produced in Minnesota or out-of-state. *Marigold v. Redalen*, 809 F.Supp. 714, 717 (D.Minn.1992). That statute required milk processors to pay the difference between $13.20 and the federal minimum price [1] into a special fund to be distributed to Minnesota milk producers, whenever the federal minimum price for milk fell below $13.20 per

---

1. Since 1937 the price of raw milk has been extensively regulated by the federal government pursuant to the Agricultural Marketing Agreement Act, 7 U.S.C. § 608c. The pricing system is administered by a "market administrator" selected by the United States Secretary of Agriculture. 7 C.F.R. § 1000.3. For administrative and price setting purposes, the country is divided into 41 milk order areas. Minnesota (except Lincoln, Nobles, Pipestone and Rock Counties) is part of the Upper Midwest Marketing Area along with bordering counties in Wisconsin, Iowa, North Dakota and South Dakota. 7 C.F.R. § 1068.2. The price of milk in each area is set monthly by the market administrator.

hundred weight. That "Minnesota premium" was to be paid both on milk produced and processed in Minnesota and on milk which was produced out-of-state but sold in Minnesota. Plaintiffs then argued that the Minnesota premium was a constitutionally impermissible burden on interstate commerce and the court agreed.

Because plaintiffs had sought a preliminary injunction, the court considered the four factors set forth in *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 114 (8th Cir. 1981) (en banc). *Marigold,* 809 F.Supp. at 719. The court found that three of the four factors favored granting plaintiffs their requested injunction. There was a substantial threat that the plaintiffs would suffer irreparable harm if relief was not granted. There was a substantial probability that the plaintiffs would prevail on the merits. The public interest favored granting the injunction. *Id.* at 720–25. The court found that one *Dataphase* factor, the balance of harm between the parties, favored neither party. *Id.* at 720–21.

In considering the likelihood of plaintiffs' success on the merits, the court found that the Minnesota premium was a direct regulation of interstate commerce which effectively set a minimum price for milk sold in Minnesota, thus negating the economic advantage of out-of-state dairy farmers who sell their milk to Minnesota processors. *Id.* at 722. The court found that the plaintiffs were likely to prevail in their argument that this minimum price violates the Commerce Clause of the United States Constitution. *Id.* at 723. The court held that, because the Commissioner was being sued in his official capacity, injunctive relief was available under 42 U.S.C. § 1983. *Id.* at 724. Therefore, the court granted plaintiffs the requested injunction.

The Commissioner did not appeal the court's order enjoining the enforcement of the premium law to the extent that it affected milk purchased from out-of-state. Rather, the Minnesota legislature repealed the affected statute and simultaneously enacted a

new "milk over-order premium [2]" statute ("new premium") which could overcome the constitutional infirmities of the enjoined law ("old premium"). The new law, Section 9 of Chapter 65 of the Laws of Minnesota (Minnesota Statutes Section 32.73), will assess a charge from dairy processors, in their role as wholesalers, whenever the federal minimum price of Class I milk falls below $13.20 per hundred weight. The assessment is calculated by multiplying the difference between the federal minimum price and $13.20 by 2.25. Thus, if the federal minimum price were set at $12.20 per hundred weight, the assessment would be $2.25 per hundred weight. The assessments are to be collected by the Commissioner from the first wholesaler, that is the dairy processor, and paid into the "Minnesota over-order premium account" which is administered by the Commissioner. The assessments are to be collected at the wholesale level and thus will apply to all milk, no matter where it was produced and processed. The assessments collected are to be distributed only to Minnesota dairy producers.

Plaintiffs' renewed motion for a preliminary injunction challenges the constitutionality this new statute. They argue that the changes in the law are primarily linguistic and that the constitutional problems with the old law have been exacerbated, rather than cured. They contend that, if the constitutional infirmities remain, enforcement of the new law should be enjoined. The Commissioner argues that the new law creates a tax which, under 28 U.S.C. § 1341, the Tax Injunction Act, is outside of the subject matter jurisdiction of a federal district court. The Commissioner also argues that under the new law non-Minnesota producers retain whatever competitive advantage they would have in the absence of the law and, therefore, that no constitutional problems exist.

## DISCUSSION

### A. The Tax Injunction Act

█ The Commissioner contends that the court cannot consider the plaintiffs' claims

---

**2.** The term "over-order premium" refers to an amount of money assessed by the Commissioner which is above the price of milk set by the

U.S.D.A. market administrator's "federal milk marketing order" for the Upper Midwest Marketing Area.

because the new statute establishes a tax and the Tax Injunction Act bars a federal district court from enjoining the collection of a state tax. *Burris v. City of Little Rock,* 941 F.2d 717, 720 (8th Cir.1991). The Tax Injunction Act provides that:

> The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such state.

28 U.S.C. § 1341. This prohibition extends to suits for injunctive relief and to § 1983 claims in which a plaintiff seeks an injunction. *Burris,* 941 F.2d at 720 (citations omitted).

■■■ Whether the new Minnesota premium is a tax is a federal question and the label given by the state is not dispositive of the court's inquiry. *Wright v. McClain,* 835 F.2d 143, 144 (6th Cir.1987) (citing *Robinson Protective Alarm, Co. v. City of Philadelphia,* 581 F.2d 371, 374–76 (3rd Cir.1978)). To determine whether the Minnesota premium is a tax, the court must look to the purpose underlying the premium. *Id.* at 145 (citations omitted); *Miami Herald Publishing Co. v. City of Hallandale,* 734 F.2d 666, 670 (11th Cir.1984) (citations omitted). Premiums imposed primarily for revenue-raising purposes are considered to be taxes. *Wright,* 835 F.2d at 145; *Miami Herald,* 734 F.2d at 670. Premiums primarily imposed for regulatory or punitive purposes, even though they may also raise revenue, generally are not considered to be taxes. *Miami Herald,* 734 F.2d at 670; *see also American Petrofina Co. of Texas v. Nance,* 859 F.2d 840, 841 (10th Cir.1988) (The mere fact a statute raises revenue does not imprint upon it the characteristics of a law by which the taxing power is exercised. (citation omitted)).

In examining the 1992 Minnesota premium the court held that the law was primarily regulatory in nature because it regulated the price processors paid for Class I milk. *Marigold,* 809 F.Supp. at 719. The new premium is regulatory in nearly the same manner. Although the base price processors pay for milk will be set by the United States Department of Agriculture when it announces the

federal minimum price, any difference between that federal minimum price and $13.20 per hundred weight will be negated by the premium. In reality, a minimum price for milk sold at wholesale in Minnesota is established. The Commissioner does not contest plaintiffs' claim in this regard. The principal difference between the old premium and the new premium is that the old premium fixed the Minnesota minimum price at $13.20 per hundred weight, whereas the more complex formula of the new premium would adjust the price to some amount over $13.20 per hundred weight, depending on the level at which the federal minimum price is set. The new premium, like the old premium, is thus primarily regulatory in nature. The fact that the new premium also raises revenue is not dispositive of the issue of whether it is a tax. *See American Petrofina,* 859 F.2d at 841. The court thus concludes that the Minnesota premium is not a tax and that the Tax Injunction Act, therefore, does not prevent the court from exercising subject matter jurisdiction over the plaintiffs' claims.

The Commissioner renews his argument that the court should decline to consider plaintiffs' claims under the principle of comity. The Commissioner again relies on *Fair Assessment in Real Estate Ass'n, Inc. v. McNary,* 454 U.S. 100, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981). The court rejected this argument previously, holding that the old premium was not a tax, thus rendering *Fair Assessment* inapplicable. *Marigold,* 809 F.Supp. at 719. Because the court finds that the new premium is also a regulation, rather than a tax, the Commissioner's present reliance on *Fair Assessment* is similarly misplaced. The court therefore concludes that it can exercise jurisdiction over the plaintiffs' claims and consider the merits of their motion for injunctive relief.

## B. *Preliminary Injunction*

■■■ The court considers four factors in determining whether to grant the plaintiffs' motion for a preliminary injunction:

> 1. Is there a substantial threat that the plaintiffs will suffer irreparable harm if relief is not granted;

2. Does the irreparable harm to the plaintiffs outweigh any potential harm that granting the preliminary injunction may cause the Commissioner;

3. Is there a substantial probability that the plaintiffs will prevail on the merits; and

4. The public interest.

*Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 114 (8th Cir.1981) (en banc). The court balances the four factors to determine whether a preliminary injunction is warranted. *Id.* at 113. The plaintiffs bear the burden of proof concerning the four factors. *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir.1987).

## 1. The Threat of Irreparable Harm

To meet their burden of proof as to this element the plaintiffs must prove that harm will result without injunctive relief and that the harm will not be compensable by money damages. Possible or speculative harm is not enough. The absence of such a showing alone is sufficient to deny a preliminary injunction. *Gelco,* 811 F.2d at 420; *Roberts v. Van Buren Pub. Sch.,* 731 F.2d 523, 526 (8th Cir.1984).

When considering the old premium, the court found that the plaintiffs were likely to suffer harm if the court denied their request for injunctive relief and they ultimately prevailed upon the merits of their claims. *Marigold,* 809 F.Supp. at 720. The new premium increases the likelihood that irreparable harm will result to the plaintiffs because of the 2.25 multiplier. Under the old premium, the difference between the federal minimum price and $13.20 per hundred weight resulted in a dollar for dollar increase in the cost of milk to the processors up to $13.20 per hundred weight. Under the new premium, with its 2.25 multiplier, whenever there is a decrease in the federal minimum price below $13.20, there will be an even greater increase in the real price of Minnesota milk. Thus, the lower the federal minimum price is set, the higher the effective Minnesota price will rise. The potential harm that the court found previously is thus increased by the new premium.

In its previous decision the court noted that under *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974), the plaintiffs' harm would not be compensable with monetary damages because of the Eleventh Amendment shield enjoyed by the states. *Marigold,* 809 F.Supp. at 720. The Commissioner now cites *Harper v. Virginia Dept. of Taxation,* —— U.S. ——, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) for the proposition that the plaintiffs would be due a refund if the premium is collected and they succeed on the merits at trial. The Commissioner's reliance on *Harper* is misplaced. *Harper* does not explicitly overrule the clear holding of *Edelman* that, through the doctrine of sovereign immunity, the Eleventh Amendment shields the states from money damage awards in the Federal District Courts. *Edelman,* 415 U.S. at 662–65, 94 S.Ct. at 1355–57. The *Harper* Court dealt with issues arising in the context of intergovernmental tax immunity and the due process requirements for relief when a State is found to have imposed a discriminatory tax. *Harper,* —— U.S. at ——, 113 S.Ct. at 2519. This court has already found that the Minnesota premium is not a tax, thus *Harper* cannot be presumed to support the Commissioner's claim that the plaintiffs would be entitled to a refund of any premium actually paid if the law is found unconstitutional.

The court therefore holds that plaintiffs have shown that irreparable harm will result in the absence of injunctive relief and that the harm will not be compensable through an award of monetary damages.

## 2. Balance of the Harm Between the Parties

The court must balance of potential harm to both the parties and to the public in deciding whether to grant injunctive relief. *Young v. Harris,* 599 F.2d 870, 879 (8th Cir.1979). Injunctive relief is not appropriate if the hardship to the defendant or to the public, should the preliminary injunction be issued, outweighs the hardship to the plaintiff, should the preliminary injunction be denied. *Id.* It is appropriate for the court to consider whether the party seeking the injunction has acted swiftly to protect its inter-

ests or whether it has delayed inordinately in seeking relief. *Id.*

When considering the old premium the court found that the balance of harm did not favor either party. *Marigold,* 809 F.Supp. at 721. Arguably, the potential harm to the plaintiffs has increased with the use of the 2.25 multiplier in the new premium formula. However, plaintiffs are large dairy processors with an ability to pass their costs along to consumers, at least in part. The plaintiffs did seek relief from the court prior to the implementation of the new premium, thus they have not been dilatory in protecting their interests. The Commissioner points to the worsening economic situation of Minnesota's dairy farmers, who are the chief beneficiaries of the new premium. However, the Commissioner still does not demonstrate that Minnesota has no other means to fund a program of dairy farmer assistance. Thus, the court concludes that the balance of harm favors neither granting nor denying the injunction. The court, therefore, must rely on the other *Dataphase* factors in determining whether injunctive relief is appropriate.

### 3. Likelihood of Success on the Merits

#### a. Commerce Clause

 The Commerce Clause " 'prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.' " *Wyoming v. Oklahoma,* —— U.S. ——, ——, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992) (quoting *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 273–274, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988). The court uses a two-tiered test to analyze state economic laws and regulations under the Commerce Clause. If a state statute directly regulates or discriminates against interstate commerce or if its effect is to favor in-state economic interests over out-of-state interests, the statute is "per se invalid" under the Commerce Clause, *Brown–Foreman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 578–579, 106 S.Ct. 2080, 2083–84, 90 L.Ed.2d 552 (1986) (citations omitted), and the burden falls upon the state "to justify it both in terms of the local benefits flowing from the statute and the unavail-

ability of non-discriminatory alternatives adequate to preserve the local interests at stake." *Wyoming,* —— U.S. at ——, 112 S.Ct. at 801 (citation omitted). When the statute has only indirect effects on interstate commerce and regulates evenhandedly, the court must examine "whether the [s]tate's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Brown–Foreman,* 476 U.S. at 579, 106 S.Ct. at 2084 (citing *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Under either tier, "the critical consideration is the overall effect of the economic regulation on both local and interstate commerce." *Id.*

The plaintiffs do not challenge Minnesota's right to establish a premium to be paid on milk produced and processed in Minnesota. Rather, they object to the way in which the premium will burden interstate commerce, favoring Minnesota based economic interests over out-of-state economic interests. The Commissioner argues that, because the premium is applied even-handedly, it does not discriminate against interstate commerce. The Commissioner contends that overt discrimination, rather than the law's actual effects on interstate commerce, are the focus of inquiry. The Commissioner further claims that a direct state subsidy to domestic industry does not violate the commerce clause. *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988).

The Commissioner's reading of the law is too narrow. Because the line between direct and indirect regulation is frequently difficult to draw, Commerce Clause analysis requires the court to consider the overall effects of the law. *Brown–Foreman,* 476 U.S. at 579, 106 S.Ct. at 2084. There are at least three ways in which the new premium either directly regulates interstate commerce or favors in-state economic interests over out-of-state interests.

First, the premium directly regulates the price of milk in Minnesota, no matter where that milk was originally produced and processed. The Commissioner never denies plaintiffs' argument that the premium effec-

tively sets the minimum wholesale price for milk. He merely denies, without argument, that this places out-of-state producers and processors at a disadvantage, claiming that they retain whatever competitive advantage they would have in the absence of the law. This denial is unconvincing. The Minnesota premium is in its effects similar to the New York law which the Supreme Court struck down in *Baldwin v. Sellig*, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935). The New York law required New York processors to pay out-of-state producers New York's minimum price for milk. *Id.* at 523, 55 S.Ct. at 500. This had the effect of preventing lower priced milk from Vermont entering and being sold in New York. *Id.* Theoretically, New York processors might have paid Vermont producers the higher price required by law, but the incentive to do so was eliminated. The Minnesota premium has the same practical effect: processors will pay a minimum price which is set by Minnesota law even when milk is produced out-of-state. As a result, the incentive to purchase milk from out-of-state will be reduced. The fact that part of that minimum price is paid to the Commissioner, instead of to the out-of-state farmer, does not negate the actual effect of the law.

Second, the premium directly regulates the terms under which an out-of-state processor may enter the Minnesota wholesale market. Processors from surrounding states will be required to pay the premium on milk which was produced and processed entirely outside of Minnesota. As a result, potential economic advantages which might exist by virtue of lower out-of-state prices for milk purchased from producers will be greatly reduced when the milk is introduced for sale in Minnesota. Even though the law does not impose a higher premium on out-of-state milk than on in-state milk, it will have the effect of reducing the amount of milk which can profitably be shipped across states lines for sale in Minnesota. Because of the 2.25 multiplier, the premium may, at times, have the effect of driving Minnesota wholesale prices out of line with wholesale prices available in neighboring states. If the premium is applied to milk as soon as its crosses a border, processors and producers in other states will

lose most of the advantage of entering the Minnesota marketplace. Loss of a competitive advantage will naturally lead to a loss of incentive to enter Minnesota markets. One can easily envision a scenario where only Minnesota processors buying from Minnesota producers will have any reason to operate in Minnesota. Thus, the effect of the premium will be an unconstitutional burden on interstate interests.

Third, although the premium will collect large amounts of revenue from both in-state and out-of-state processors, the benefits will be confined to Minnesota dairy producers. The court finds that plaintiffs are likely to prevail in their argument that this favors in-state economic interests at the expense of out-state economic interests. The effect of the premium is to subsidize Minnesota farmers by collecting the premium, at least in part, from non-Minnesota processors or from milk processed in Minnesota, but produced out-of-state. The premium law is thus invalid on a per se basis under *Brown–Foreman*, unless the Commissioner can justify the economic regulation in terms of the benefits it provides the state and the lack of non-discriminatory alternatives.

The Commissioner's arguments are unavailing. First, the Commissioner again cites *Henneford v. Silas Mason Co.*, 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937) for the proposition that state assessments on imported goods are valid so long as the burden falls equally on in-state and out-of-state interests. The court previously found that *Henneford* did not apply to economic regulations. *Marigold*, 809 F.Supp. at 722. Because the court finds that the new premium is, like the old premium, an economic regulation and not a tax, *Henneford* does not apply to the court's analysis here.

Second, the Commissioner cites *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988) in arguing that direct state subsidies to domestic industries are permissible under the Commerce Clause. Again, the Commissioner turns to a tax case which is not applicable to the court's consideration of direct economic regulation. The premium distribution is

more than the granting of a tax break, it directly redistributes wealth from both in-state and out-of-state processors to in-state producers only. This is not a subsidy financed out of the state's treasury. This is not a tax credit designed to help new industries become established. Rather, the premium forces those who would sell their dairy products in Minnesota to subsidize Minnesota's farmers.

The court is not unsympathetic to the Commissioner's attempted justification of the premium as a way to reverse the economic decline of Minnesota's farmers and rural areas. However, the court is not persuaded by the Commissioner's assertion that out-of-state farmers will not be disadvantaged by the premium law. Minnesota processors will lose at least part of the incentive to purchase out-of-state milk. Out-of-state processors will lose their incentive to sell in Minnesota. Out-of-state farmers will receive no benefit from the premium which will be at the heart of the disincentive. The Commerce Clause does not prohibit a state from assisting its own residents, it does, however, prohibit a state from burdening interstate commerce in the process.

### b. Section 1983

The court also finds that the plaintiffs are likely to succeed on the merits of their claim that enforcement of the new premium will deprive them of their rights under the Commerce Clause in violation of 42 U.S.C. § 1983. Violations of the Commerce Clause may be the basis of § 1983 actions. *See Dennis v. Higgins,* 498 U.S. 439, 449–50, 111 S.Ct. 865, 872–73, 112 L.Ed.2d 969 (1991). The plaintiffs have brought this action against the Commissioner in his official capacity, thus overcoming any difficulty posed by the State's immunity under the Eleventh Amendment. *See Kentucky v. Graham,* 473 U.S. 159, 169, n. 18, 105 S.Ct. 3099, 3107, n. 18, 87 L.Ed.2d 114 (1985). Given the court's conclusion that the plaintiffs are likely to succeed on the merits of their claim that the Minnesota premium violates the Commerce Clause, the court concludes that the plaintiffs are likely to succeed on the merits of their claims against the Commissioner.

### 4. The Public Interest

The public interest was considered by the court in previously deciding to enjoin the enforcement of the old premium. The analysis involved in that decision continues to apply. Minnesota residents have an interest in ensuring that Minnesota has the ability to raise the revenue necessary to assist state dairy farmers and farm communities. However, those interests are outweighed by the public's interest in ensuring that farmers are able to compete in markets which are free of undue burdens, thus ensuring lower prices of milk when sold at retail. Free access to markets is at the heart of the Commerce Clause. *See H.P. Hood & Sons v. Du Mond,* 336 U.S. 525, 539, 69 S.Ct. 657, 665, 93 L.Ed. 865 (1949). Free access can occur only when the regulations imposed by the states do not provide an advantage to in-state interests at the expense of out-of-state interests. The court, therefore, concludes that the Minnesota premium is likely to be found to be not in the public's interest because of the burdens it places on the marketplace.

### CONCLUSION

Based on the foregoing, the court concludes that the plaintiffs have satisfied their burden under *Dataphase* and injunctive relief is appropriate. The court notes that entry of a preliminary injunction will maintain the status quo until the constitutionality of the Minnesota law can be resolved. The preliminary injunction, however, will not take effect until the plaintiffs post a $200,000 bond. *See* Fed.R.Civ.P. 65(c).

Accordingly, **IT IS HEREBY ORDERED** that the Commissioner or any other person or organization shall:

1. Cease from enforcing or attempting to enforce Section 9 of Chapter 65 of the Laws of Minnesota 1993 (Minnesota Statutes Section 32.73), and the rules and regulations promulgated thereunder, to require Minnesota or out-of-state dairy processors to pay the Minnesota premium or any other minimum price on Class I milk they purchase from out-of-state dairy farmers, pending the final resolution of this matter; and

2. Cease from enforcing or attempting to enforce Section 9 of Chapter 65 of the Laws of Minnesota (Minnesota Statutes Section 32.73), and the rules and regulations promulgated thereunder, by basing, in whole or in part, the assessments to be collected from Minnesota dairy processors upon the quantity of Class I milk that Minnesota dairy processors purchase from out-of-state dairy farmers, for sale in Minnesota, pending the final resolution of this matter.

**IT IS FURTHER ORDERED** that pursuant to Rule 65(c) of the Federal Rules of Civil Procedure the preliminary injunction will not take effect until the plaintiffs post a $200,000 bond approved by the court.